Dorothy UPDYKE, Appellee,

v.

**BP OIL COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued May 20, 1998.

Filed Aug. 14, 1998.

Thomas Ferguson, Pittsburgh, for appellant.

James B. Cole, Pittsburgh, for appellee.

Before DEL SOLE and JOYCE, JJ., and MONTEMURO*, Senior Judge.

MONTEMURO, Senior Judge:

BP Oil Company (BP) appeals from the judgment entered in the Court of Common Pleas of Allegheny County on August 1, 1997. We affirm.

Dorothy Updyke, Appellee, then 79 years old, broke her ankle on February 19, 1993, after slipping on a patch of ice at a combination gasoline station and convenience store owned and operated by BP. After her car broke down on a public road adjoining BP's property, Updyke entered BP's premises for the sole purpose of using a telephone to call her mechanic. Upon approaching BP's store, she passed, without noticing, a public pay phone located at the periphery of the property. She entered the shop and asked a clerk for permission to use the store's private telephone. The clerk, in accordance with company policy, denied Updyke's request and directed her to the pay phone outside. Upon discovering that the pay phone would not accept her quarter, Updyke walked back toward the store to make another attempt at using the private phone located inside. On this return voyage, she slipped and fell on a patch of clear ice. As a result of the accident, she suffered a severely broken ankle.

Prior to the taking of testimony at trial, BP requested a determination of Updyke's legal status on the property. The trial judge determined that Updyke was a public invitee to whom BP owed a duty to discover and remove the ice patch rather than a licensee to whom no such duty applied. In reaching this conclusion, the trial court relied upon the existence of the public pay phone on the premises and the large lettering on the canopy overhanging the service area reading "Welcome." At trial, Updyke testified that the ice patch was visible; however, no evidence was presented that BP had actual notice of the danger. At the close of evidence, the trial court instructed the jury that Updyke was a public invitee and charged on the duties related to this status. The jury returned a verdict of $120,000 in favor of Updyke. After denying BP's motion for post-trial relief, which sought, *inter alia,* judgment notwithstanding the verdict, the trial court entered judgment on August 1, 1997 of $144,073.72, which in addition to the amount provided by the jury, reflected an award of delay damages.

BP makes several claims on appeal:

A. Judgment Notwithstanding the Verdict should have been granted in favor of [BP] because [Updyke] was a gratuitous licensee as a matter of law pursuant to the undisputed facts of record, and the undisputed facts of record also show that [BP] breached no duty owed to a gratuitous licensee.

B. In the alternative, [BP] should have been granted a new trial on liability for the following reasons:

1. [Updyke] was a gratuitous licensee as a matter of law, but the Court erroneously charged the jury, as a matter of law, that [Updyke] was a "public invitee" to whom a higher duty of care was owed.

2. If [Updyke] was not a "gratuitous licensee" as a matter of law, [Updyke's] status as a "gratuitous licensee" or "public invitee" was a question for the jury.

3. The Court erred as a matter of law in prohibiting [BP's] testimony that there were no prior accidents or complaints similar to [Updyke's] accident, to demonstrate that [BP] had no notice of an allegedly dangerous condition in its premises.

4. The Court erred as matter of law by failing to charge on the choice of ways doctrine, which was crucially relevant to [BP's] comparative negligence.

C. In the alternative, [BP] should have been granted a new trial on damages, because the Court committed a fundamental legal error through its *sua sponte* introduction of a life expectancy table, and its inaccurate instruction that the 84 year old [Updyke's] remaining life expectancy as indicated

* Retired Justice Assigned to Superior Court.

thereby was ten years, in its charge to the jury on calculating damages, especially because there was a paucity of evidence in the record of material facts relevant to [Updyke's] remaining life expectancy.

(Appellant's Brief at 4).

An appellate court reviewing a trial court's refusal to grant JNOV must determine "whether, when viewing the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict." *Adamski v. Miller*, 545 Pa. 316, 319, 681 A.2d 171, 173 (1996). The trial court may be reversed "only if we find an abuse of discretion or an error of law which controlled the outcome of the case." *O'Sullivan v. Joy Technologies*, 446 Pa.Super. 140, 147, 666 A.2d 664, 667 (1995). "[T]he trial court's conclusions of law are not binding on an appellate court, whose duty it is to determine whether there ·was a proper application of law to the facts by the trial court." *Thatcher's Drug Store v. Consolidated*, 535 Pa. 469, 477, 636 A.2d 156, 160 (1994).

■ In the instant case, BP claims that the trial court erred in determining as a matter of law that Updyke was a public invitee rather than a licensee at the time of the accident. The duty of a possessor of land toward a third party entering the land depends upon whether the entrant is a trespasser, licensee, or invitee. *Palange v. Philadelphia Law Dept.*, 433 Pa.Super. 373, 375–77, 640 A.2d 1305, 1307 (1994). The Restatement (Second) of Torts defines a trespasser as "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329; *Palange*, 433 Pa.Super. at 375–77, 640 A.2d at 1307. "A licensee is a person who is privileged to enter or remain on the land only by virtue of the possessor's consent." Restatement (Second) of Torts § 330; *Palange*, 433 Pa.Super. at 377–79, 640 A.2d at 1308. The status of invitee is defined as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.

Restatement (Second) of Torts § 332; *Palange*, 433 Pa.Super. at 375–77, 640 A.2d at 1307.

In the instant case, BP does not argue that Updyke was a trespasser. Also, ₌Updyke does not argue, nor do the facts support, that she was a business invitee. Updyke indicated in her own testimony that she did not intend to purchase anything at the store and that her sole purpose for entering the land was to use a telephone. Further, no evidence exists that BP received a portion of the profit from the telephone. Therefore, Updyke was either a licensee or a public invitee.

■ In order to attain the status of public invitee the individual must "enter the premises upon invitation *and* 'for a purpose for which the land is held open to the public.'" *Palange*, 433 Pa.Super. at 379, 640 A.2d at 1308 (quoting Restatement (Second) of Torts § 332(2)). Comment b to § 332 discusses the distinction between invitation and permission which is central to a determination of whether an entrant is an invitee or a licensee:

*Invitation and Permission.* Although invitation does not in itself establish the status of an invitee, it is essential to it. An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land: permission is conduct which justifies others in believing that the possessor is willing that they shall enter if they so desire.

Restatement (Second) of Torts § 332 cmt. b.

In the instant case, the undisputed facts demonstrate as a matter of law that Updyke was a public invitee, as she entered the

premises to use a public telephone maintained by BP on its property for the use of the public. Also, BP emblazoned the word "Welcome" on the canopy over the service station, thereby clearly inviting the public. Finally, the clerk directed Updyke toward the outside telephone thereby expressly inviting her on the land for the purpose of using the public telephone.

BP cites language from the Restatement and case law indicating that in order to qualify as an invitee the landowner must receive a benefit from the entrant's presence. However, while this language may be helpful in distinguishing between a business visitor and a licensee, this landowner interest requirement need not exist to find an individual a public invitee. Comment d to § 332 of the Restatement states that

> [w]here land is held open to the public, it is immaterial that the visitor does not pay for his admission, or that the possessor's purpose in so opening the land is not a business purpose, and the visitor's presence is in no way related to business dealings with the possessor, or to any possibility of benefit or advantage, present or prospective, pecuniary or otherwise to the possessor.

Restatement (Second) of Torts § 332 cmt. d. Examples provided in the comments further demonstrate this principle. In Comment d to § 332 we find that

> [w]hen a landowner tacitly permits the boys of the town to play ball on his vacant lot they are licensees only; but if he installs playground equipment and posts a sign saying that the lot is open free to all children, there is then a public invitation, and those who enter in response to it are invitees.

*Id.* Also, the comments provide us with the following illustration:

> A maintains in his drugstore a free telephone for the use of the public. B enters the store for the sole purpose of using the telephone. B is an invitee.

*Id.* at illustration 4.

These examples illustrate that the distinction between invitee and licensee cannot depend upon the possessor's interest in having the entrant on the land. Rather, the relevant question is whether BP desired the presence of the public. This question may be answered by determining whether the possessor held the land open for a public purpose and issued an invitation of some sort, facts plainly evident in the instant case.

BP argues that at the very least, Updyke's status changed from public invitee to licensee at the point when she began walking back towards the store to use the private phone after discovering that the public phone was disabled. We disagree based upon this court's decision in *Trude v. Martin*, 442 Pa.Super. 614, 660 A.2d 626 (1995). There the plaintiff, Trude, was severely injured when the concrete capstone on top of a brick wall upon which he was sitting gave way, causing him to plummet to the ground. *Id.* at 620–22, 660 A.2d at 629. Trude initially entered Donati's restaurant to paint a door at the rear of the premises. *Id.* at 619–20, 660 A.2d at 628. After finishing his work, he entered the bar section of the restaurant and remained there until after closing. *Id.* The bartender allowed Trude and several other people to leave the premises through the kitchen, an exit not designated for customer use. *Id.* at 620–22, 660 A.2d at 629. This exit "consisted of a door, a landing surrounded by a waist-high brick wall with a concrete capstone on it, and stairs leading from the landing down to the parking area." *Id.* at 620, 660 A.2d at 628. Trude walked out the door, down the stairs and into the parking area. *Id.* at 620–22, 660 A.2d at 629. When another individual began shouting and swinging at Trude, he ascended the stairs and sat on the wall. *Id.* The combative individual then pushed Trude, causing the capstone on top of the wall to dislodge, resulting in a fall which broke Trude's neck. *Id.* This Court held that

> Trude was an invitee on the premises and had not exceeded the scope of his privilege to be on the premises when he left the building through the kitchen door exit. Therefore, Trude did not lose his status as an invitee and become a trespasser merely by exiting Donati's and proceeding down the back stairs to the parking lot.

*Id.* at 626, 660 A.2d at 631.

Thus, despite the fact that Trude returned to the stairs and landing area, the court held

that he did not lose his invitee status. Similarly, in the instant case, Updyke did not surrender her invitee status merely because she discovered that the pay phone was broken. Therefore, because Updyke was an invitee at the time she entered the property and retained that status through the time of the accident, the trial court ruled correctly as to her status on BP's land.[1]

BP's second argument, that a new trial should be granted because the trial judge erroneously charged the jury that Updyke was a licensee, is resolved in Updyke's favor as a result of our conclusion that she was a public invitee.

BP's next argument, that Updyke's status was a question of fact for the jury also fails. The facts of the instant case are not in dispute; therefore, the question was properly decided as a matter of law. *Palange*, 433 Pa.Super. at 375–77, 640 A.2d at 1307.

■ BP also contends that the trial judge erred when he sustained Updyke's objection when BP asked whether any previous fall claims had been received by the store. The purpose of the question, according to BP, was to elicit testimony that BP did not have *constructive notice of the ice patch*. However, counsel's choice of the word claim was inadequate and misleading as to whether BP had constructive notice of a dangerous condition. As the trial court aptly stated, the use of the word

> "claim" establishes that counsel was inquiring not about past fall occurrences, knowledge of which may have been relevant to prove or disprove notice, but about past assertions of right stemming from any such falls. While such assertions, once made, might serve as notice of underlying

fall incidents, the *absence of such assertions does not establish* nor necessarily even suggest, the *absence of fall down incidents*. An individual, had he or she fallen, might for any number of reasons, abstain from filing a *claim*, though entertaining no doubt whatsoever about the *occurrence* of the fall, the injuries it caused or the damages sustained. Conversely, any miscreant sufficiently devious to do so, might fabricate a *claim* even when there had been no fall down *occurrence*.

(Trial Ct. Op. at 8–9) (emphasis in original).

BP argues that the purpose of the question was to "elicit testimony from its witness … that no prior complaints or accidents similar to the one alleged by [Updyke] had occurred in the three and one-half years that Ms. Harpster had managed [BP's] store." (Appellee's Brief at 25). However, clearly BP did not ask this question, rather, counsel asked only whether the manager had knowledge of prior claims. The trial court sustained the objection to this question, and BP's counsel terminated examination of the witness without further inquiry as to witness' awareness of any prior accidents or complaints.

■ Next, BP complains that the trial court erred in refusing to instruct the jury on the "choice of ways" doctrine. " 'Where a person, having a choice of two ways, one of which is perfectly safe, and the other of which is subject to risks and dangers, voluntarily chooses the latter and is injured, he is guilty of contributory negligence …' " *Quinn v. Funk Building Corp.*, 437 Pa. 268, 273, 263 A.2d 458, 461 (1970) (quoting *DeFonde v. Keystone Valley Coal Co.*, 386 Pa. 433, 434, 126 A.2d 439, 439 (1956)).

1. We take this opportunity to express our dissatisfaction with the common law categories of landowner liability, under which, had the facts been slightly different, Updyke, engaging in no unusual or dangerous activity would be owed a different duty of care than other people entering the premises. BP anticipated that people would traverse its property and therefore should be expected to maintain an equal duty of care to all people doing so. Accordingly, we contend the Commonwealth would be better served by eliminating these antiquated categories and instead imposing on owners and occupiers a single duty of care in all circumstances.

In *Antonace v. Ferri Contracting Company, Inc.*, 320 Pa.Super. 519, 467 A.2d 833 (1983), this Court noted its dissatisfaction with the "common law status distinction of invitee, licensee, and trespasser." *Id.* at 529, 467 A.2d at 838. The court traced the origins of these classifications and noted "a significant, albeit minority, trend toward abolishing the common-law categories …" *Id.* at 529, 467 A.2d at 838–39. Presently, we reiterate our suggestion that the common law categories be abolished in favor of a "single standard of reasonable care under the circumstances." *Id.* at 529, 467 A.2d at 839.

[T]o warrant an instruction on "choice of ways", there must be evidence that the plaintiff made an unreasonable decision which exposed him to a hazard that he knew or should have known existed. There must be evidence of (1) a safe course, (2) a dangerous course, and (3) facts which would put a reasonable person on notice of the danger or actual knowledge of the danger.

*Downing v. Shaffer*, 246 Pa.Super. 512, 519, 371 A.2d 953, 956 (1977)(citing Restatement (Second) of Torts § 466 cont. f and g). This doctrine still exists in Pennsylvania despite substitution of comparative negligence for contributory negligence. *See O'Brien v. Martin*, 432 Pa.Super. 323, 638 A.2d 247 (1994).

■ In the instant case, BP clearly was not entitled to a jury instruction on the doctrine, as Updyke had neither actual nor constructive notice of the ice patch. Every witness providing testimony about the ice indicated that the patch was difficult to see. In fact, one of BP's employees testified that while inspecting the ground after the accident, he could not see the ice until he was "[a]bout right on it. Two, three feet maybe." (N.T. 3/14/97 at 362). This employee also described the patch as "penny thin." (*Id.*). Therefore, as the ice patch was difficult to see, even to those actually looking for the danger, no reasonable person in Updyke's position could be expected to use a different route.

BP argues that Updyke's testimony that she was in a hurry demonstrates evidence rendering a choice of ways charge appropriate. However, the consistent testimony of the witnesses that the danger was invisible from a distance clearly demonstrates that she did not have enough notice of the patch to alter her general route. Updyke's alleged lack of caution in failing to see and avoid the ice patch was therefore appropriately before the jury as a question of comparative negligence.

■ Finally, BP argues that a new trial on damages is necessary because the trial court *erred* in introducing mortality tables and instructed incorrectly on their use. The trial judge, recognizing evidence that Updyke's injury might be permanent, introduced mortality tables, charts which calculate average life expectancy, for the jury to consider when contemplating an award of future damages. The standard for the use of mortality tables was set forth by this Court as follows:

It is well settled that mortality tables are admissible in Pennsylvania for the purpose of determining a plaintiff's future damages. However, in instructing the jury on the use of such tables, the court is required to instruct the jury that certain variables must be taken into consideration in determining the possible duration of life. The court's instructions must include a survey of such matters as sex, prior state of health, nature of daily employment, and its perils, if any, manner of living, personal habits, individual characteristics, and other facts concerning the injured party which may affect the duration of his or her life. Since mortality tables are not to be applied rigidly, failure to adequately instruct the jury on their use constitutes reversible error and warrants the grant of a new trial on the issue of damages. Moreover, the decision on whether or not to grant a new trial is committed to the sound discretion of the trial court, and such a decision will not be reversed on appeal absent a showing that the trial court committed an error of law or palpably abused its discretion.

*Helm v. Eagle Downs–Keystone Racetrack*, 385 Pa.Super. 550, 552–53, 561 A.2d 812, 813 (1989) (citations omitted). The trial judge, reading directly from the Pennsylvania Suggested Standard Jury Instructions (Civil) § 6.21, provided the following instruction:

If you find that the Plaintiff Dorothy Updyke's injuries will continue beyond today, you must determine the life expectancy of the Plaintiff, Dorothy Updyke. According to statistics compiled by the United States Department of Health, Education and Welfare, the average life expectancy of all persons of the Plaintiff's age at the time of the accident, her sex and her race, was ten years.

This figure is offered to you only as a guide, and you are not bound to accept it if you believe that the Plaintiff, Dorothy Up-

dyke, would have lived longer or less than the average individual in her category.

In reaching this decision, you are to consider the Plaintiff's health prior to the accident, her manner of living, her personal habits and other factors that may have affected the duration of her life.

(N.T. 3/14/97 at 499–500).

We find that the use of mortality tables was warranted here as an abundance of evidence existed regarding Updyke's prospective longevity. As the trial court observed:

the record establishes that Ms. Updyke, even at 84 years of age, was a healthy, active woman who had never before suffered a serious injury. She testified at trial that she continued to drive her own car and care for herself. The record establishes further that following retirement as a teacher's aide almost twenty years prior to the mishap here in question, Ms. Updyke had pursued the trade of dressmaking and continued, as of the time of trial to develop and serve her client base. [Updyke's] appearance at trial was robust and left little doubt that the 9.2[2] year life expectancy appearing in the U.S. Government table was amply supported.

(Trial Ct. Op. at 14–15).

██ BP also contends that the trial judge must not only list the general factors relevant to longevity but also include a review of the evidence from trial applicable to those factors. However, the case law does not require that the trial judge painstakingly repeat every shred of evidence relating to the determination of the victim's life expectancy.

In *DiPietro v. Great Atlantic & Pacific Tea Co.*, 315 Pa. 209, 173 A. 165 (1934), the primary case relied upon by BP, the trial court gave the following instruction:

Under the practice in the courts of this State, certain mortality tables have been offered in evidence and are properly received and you may give them due weight after you have had instructions. They are the result of experience and study and observation of certain insurance companies

to determine the expectancy of life and you understand, assuming that Morando's age is 36, his health good, you may consider and receive some aid from these tables which give his expectancy, the time which he might be expected to live, as some thirty years. But you must not rely to a great extent upon these tables use them only as an aid. As you know, there can be no rule by which we can measure the future of a life, so you will consider what Morando's condition was at the time of the accident, *what was his health, the character of his employment, the nature of his employment and all of the attending circumstances* given you, and the true conditions at that time and then what aid you may receive from these tables, you use in determining what you believe to be his reasonable expectancy of life.

*Id.* at 213, 173 A. at 167 (emphasis added). Our Supreme Court found this instruction inadequate because "[n]othing was said about plaintiff's 'manner of living, personal habits, individual characteristics and such other facts [heredity and environment for instance] as may affect the duration of his life[.]' " *Id.* at 214, 173 A. at 167. The contrast between the charge given and the charge required focused upon what factors were listed. The Supreme Court did not include the absence of specific facts as to the health of the victim as a concern. The only feasible reason for the omission is that the trial court mentioned health as a general factor for the jury to consider.

In *Helm, supra,* we again found that the charge must include a review of relevant factors, not every shed of evidence relating to those factors. There, the trial judge instructed the jury as follows:

Ladies and gentlemen, with respect to future pain and suffering, there are standard life tables which have been issued by the [sic] government agency and which the court now takes judicial notice, which indicate that a man of Mr. Helm's age, now 47, has a life expectancy statistically of 25 years. That does not mean that you have

---

2. The figure listed in the table is actually 9.1 years. Standard Jury Instructions (Civil) § 6.21,

Appendix.

to use that figure. You could determine, if you feel it to be inappropriate under the evidence that you have heard or seen, that you would expect him to live longer or less long, that the statistical life expectancy is 25 years for a person of Mr. Helm's status.

*Id.* at 553, 561 A.2d at 813. This court found this instruction inadequate because the trial "court failed to inform the jury that certain *factors* may affect the duration of the appellant's life." *Id.* at 553, 561 A.2d at 813 (emphasis added). Obviously, the difficulty with this charge was that the trial judge listed no general factors mitigating strict application of the tables. *Id.* at 553–54, 561 A.2d at 814.

In the instant case, the trial judge, in accordance with the standard jury instructions, informed the jury not only that the tables were merely an aid, but also referred to those general factors which could affect her longevity. The jury's duty was to review the evidence relevant to these factors and reach a conclusion.

 Further, assuming, *arguendo,* the charge on the use of mortality tables was insufficient, BP was not harmed. In fact, as the evidence demonstrated that Updyke was an extremely healthy individual, BP could only benefit from not having the evidence reiterated by the trial court. BP argues that the jury should have been informed that Updyke's longevity was threatened because she lived in a dangerous neighborhood and she drove a car while suffering from glaucoma. We first note that BP never requested that the trial judge include more factors or that he review the evidence for the jury. Moreover, BP's suggested charge would require the trial judge to instruct the jury on a subjective condemnation of Updyke's neighborhood as dangerous without any evidence in the record to support such a conclusion. Also, despite BP's assertion that Updyke is a "prime target for the cruel and brutal forces of this world," (Appellee's Brief at 32), we point out that she has managed to survive well into her eighties. Further, although Updyke *did admit* to having some glaucoma, she also indicated that she wore eyeglasses to correct the problem.

BP further claims the mortality table charge was reversible error because the 10–year figure provided by the trial judge was not the exact number listed in the table. The trial court informed the jury that, according to the tables, Updyke's life expectancy was ten years. In actuality, the figure for a black female aged 79, her age at the time of the accident, is 9.1 years. We find this slight variation insignificant in view of the table's utility only as a guide and the aforementioned evidence of Updyke's excellent health.

Accordingly, for the foregoing reasons, we affirm the order of the trial court.

Order affirmed.