Justice ZAPPALA joins this dissenting opinion.

Hope L. GUTTERIDGE, Executrix of the Estate of Charles E. Gutteridge, deceased, and widow in her own right, Appellant,

v.

A.P. GREEN SERVICES, INC., A.W. Chesterton, Inc., ACandS, Inc., Alliedsignal, Inc. and Pecora Corporation, Appellees.

Hope L. Gutteridge, Executrix of the Estate of Charles E. Gutteridge, deceased, and widow in her own right, Appellant,

v.

A.P. Green Services, Inc., A.W. Chesterton, Inc., ACandS, Inc., Alliedsignal, Inc. and Hercules Chemical Company, Inc., Appellees.

Hope L. Gutteridge, Executrix of the Estate of Charles E. Gutteridge, deceased, and widow in her own right, Appellant,

v.

A.P. Green Services, Inc., A.W. Chesterton, Inc., ACandS, Inc., Alliedsignal, Inc. and Philadelphia Electric Company, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 26, 2001.

Filed June 20, 2002.

Reargument Denied Aug. 28, 2002.

the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

*United States v. Bagley*, 473 U.S. 667, 682–83, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985). *See also United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 ("When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.")

Robert E. Paul, Philadelphia, for appellant.

Timothy D. Rau, Philadelphia, for Pecora Corporation.

Thomas E. Seus, Philadelphia, for Hercules Chemical Company, Inc.

Robert B. Lawler, Philadelphia, for Philadelphia Electric Company.

Before HUDOCK, STEVENS and OLSZEWSKI, JJ.

HUDOCK, J.

¶ 1 This is a consolidated appeal and multiple cross-appeals from several trial court orders granting summary judgment in favor of certain defendants in a mass tort action predicated on exposure to asbestos and asbestine products. For the reasons set forth below, we reverse.

¶ 2 On April 4, 1997, Charles E. Gutteridge commenced suit in the Court of Common Pleas of Philadelphia County. An amended complaint was filed on November 18, 1997, alleging that Mr. Gutteridge, because of his employment at certain jobs between the years 1944 and 1989, was exposed to asbestos and asbestos-containing products. The amended complaint additionally avers that Mr. Gutteridge contracted mesothelioma as a result of this work-related exposure to asbestos. Mr. Gutteridge died on June 5, 1997. *See* Trial Court Opinion, 2/27/01, at 1 (explicating averments in amended complaint). His wife, Hope L. Gutteridge, subsequently was substituted as the plaintiff in the action underlying this appeal.

¶ 3 The matter proceeded through discovery toward a jury trial. However, on March 6, 1998, M.H. Detrick Co. filed a suggestion of bankruptcy. On November 27, 2000, the trial court granted partial summary judgment and dismissed all claims against A.P. Green Services, American Hoist & Derrick, Asbestospray Corporation, Beazer East, Crouse–Hinds, M.H. Detrick Co., Mobile Oil, Pneumo Abex, Vellumoid, Inc., W.R. Grace, Weil McClain and Garlock, Inc. The following day, November 28th, the trial court granted summary judgment in favor of Selby, Battersby & Co., and dismissed all claims as to these defendants. The same day, Babcock and Wilcox Co. filed a suggestion of bankruptcy. On November 29, 2000, the trial court granted summary judgment in favor of Hercules Chemical Co., Inc., Brand Insulation, Inc., and Pecora Corporation. Although the trial court initially denied summary judgment to John Crane, Inc., the trial court entered summary judgment in favor of this defendant on December 5, 2000. That same day, the trial court denied summary judgment to defendant Flintkote, Inc. On December 20, 2000, the Honorable Genece Brinkley entered an order designating the case as "settled after assignment for trial." This order was docketed in the trial court on December 27, 2000, and marked "notice given under Rule 236."

¶ 4 Mrs. Gutteridge (Appellant) filed a notice of appeal on December 26, 2000. On that same day, Hercules Chemical Company, Inc. (Hercules), Pecora Corporation (Pecora) and PECO Energy Company (f/k/a Philadelphia Electric Company) (PECO) lodged cross-appeals via separate notices of appeal from the trial court's orders. (Hereinafter, consistent with Rule of Appellate Procedure 908, Hercules, Pecora and PECO are referenced collectively as "Appellees.") On January 17, 2001, the trial court entered an order directing Appellant to file a concise statement of matters complained of on appeal. She complied on February 5, 2001. The trial court subsequently filed a full opinion. The trial court did not enter a Rule 1925(b) order with regard to the cross-appeals.

¶ 5 Before addressing the parties' substantive claims, we must first determine whether this consolidated appeal stems from a final order. This matter is jurisdictional. When an order underlying an appeal is neither a final order nor an interlocutory order which is appealable as of right, and does not comprise an interlocutory order heard by permission, there is no basis upon which this Court may assert jurisdiction in the matter. *Puricelli v. Puricelli,* 446 Pa.Super. 493, 667 A.2d 410, 413 (1995). *See Fried v. Fried,* 509 Pa. 89, 97, 501 A.2d 211, 216 (1985) (quashing an appeal from an interlocutory and unappealable order).

¶ 6 Subject to exceptions, "an appeal may be taken as of right from any final order of an administrative agency or lower court." Pa.R.A.P. 341(a). A final order is any order that disposes of all claims and all parties, or any order that is expressly defined as a final order by statute, or any order entered as a final order pursuant to Rule of Appellate Procedure 341(c) (determination of finality). *Id.,* subsection (b). At first glance, it would appear that the orders granting summary judgment in this case are not final and appealable. Sixteen named defendants remained after the trial court granted summary judgment in favor of Appellees. Nevertheless, the trial court docket indicates that the Honorable Genece Brinkley signed an order on December 20, 2000, stating that the case was "settled after assignment for trial." Order, 12/20/00. Furthermore, the certified record discloses that notice of this order was provided as required by Rule of Civil Procedure 236.

¶ 7 A trial court order declaring a case settled as to all remaining parties renders prior grants of summary judgment final for Rule 341 purposes, even if the prior orders entered disposed of fewer than all claims against all parties. *Baker v. Cambridge Chase, Inc.,* 725 A.2d 757, 762 (Pa.Super.1999). Such an order is itself finalized by delivery of notice under Rule 237. *Gavula v. ARA Services, Inc.,* 756 A.2d 17, 19 (Pa.Super.2000). In the present case, all parties are now settled, dismissed by order of summary judgment, or bankrupt. *See Prelude, Inc. v. Jorcyk,* 695 A.2d 422, 423 (Pa.Super.1997) (*en banc* ) (concluding that otherwise proper appeal proceedings may go forward against non-bankrupt parties). Because the requisites to a final order have been met, we conclude that the consolidated appeal is properly before us and that we have jurisdiction to proceed.

¶ 8 Appellant raises five arguments for our consideration:

1. Did the lower court commit an error of law in making factual determinations and disbelieving certain testimony offered by Plaintiff–Appellant in opposition to the [Appellees'] motions for summary judgment when credibility issues should be determined by a jury?

2. Was PECO liable for injuries to workmen on premises that it owned and over which it retained control?

3. Was PECO liable for dangerous conditions on its premises and did it have a duty to warn business invitees as to any dangers of which it knew or should have known?

4. Did the lower court commit an error of law in applying the *Eckenrod*[1] standard to PECO's liability in this case when it found Mr. Gutteridge's exposure to asbestos on PECO premises or in misapplying *Eckenrod* under the circumstances?

5. Did the lower court err in refusing to use circumstantial evidence?

1. *Eckenrod v. GAF Corporation,* 375 Pa.Super. 187, 544 A.2d 50 (1988).

Appellant's Brief at 4. Appellees have not identified new issues pursuant to their cross-appeals. Rather, they have phrased their contentions in the form of counter-statements of the issues raised by Appellant in her appeal. Before proceeding to the merits of the claims, we note that the parties have relied upon numerous opinions filed by federal courts in support of their arguments. Federal court decisions do not control the determinations of the Superior Court. *Werner v. Plater–Zyberk,* 799 A.2d 776 (Pa.Super.2002); *Kleban v. National Union Fire Insurance Co.,* 771 A.2d 39, 43 (Pa.Super.2001). Our law clearly states that, absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved. *Commonwealth v. Lambert,* 765 A.2d 306, 315 n. 4 (Pa.Super.2000), *cert. denied,* 121 S.Ct. 1353, 532 U.S. 919, 149 L.Ed.2d 284 (2001). *Accord Cambria–Stoltz Enterprises v. TNT Investments,* 747 A.2d 947, 952 (Pa.Super.2000).

¶ 9 Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Capek v. Devito,* 564 Pa. 267, 270 n. 1, 767 A.2d 1047, 1048 n. 1 (2001). The moving party has the burden of proving that no genuine issues of material fact exist. *Rush v. Philadelphia Newspapers, Inc.,* 732 A.2d 648, 650 (Pa.Super.1999). In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Potter v. Herman,* 762 A.2d 1116, 1117–18 (Pa.Super.2000). Thus, summary judgment is proper only when the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Id.* at 1117. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. *Basile v. H & R Block, Inc.,* 563 Pa. 359, 365, 761 A.2d 1115, 1118 (2000).

¶ 10 As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. *Potter,* 762 A.2d at 1118. With regard to questions of law, an appellate court's scope of review is plenary. *Capek,* 564 Pa. at 270 n. 1, 767 A.2d at 1048 n. 1. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. *Potter, supra.* Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration. *Lachat v. Hinchliffe,* 769 A.2d 481, 487 (Pa.Super.2001).

¶ 11 Appellant first argues that the trial court erred in making factual and credibility determinations in response to Hercules and Pecora's motions for summary judgment. Appellant contends the trial court invaded the province of the jury by believing the depositions presented by Hercules and Pecora while rejecting as non-credible deposition testimony favorable to Appellant. Credibility is a matter for the jury, as is the weight to be accorded to particular pieces of evidence. *See Martin v. Evans,* 551 Pa. 496, 505, 711 A.2d 458, 463 (1998) (explaining that credibility determinations are within the sole

province of the jury, which is entitled to believe all, part or none of the evidence presented). Moreover, credibility of evidence is not a proper consideration at the summary judgment stage because the trial court may not summarily enter judgment when the evidence depends on oral testimony. *Resolution Trust Corp. v. Urban Redevelopment Authority*, 536 Pa. 219, 225, 638 A.2d 972, 975 (1994).

¶ 12 To survive a motion for summary judgment in an asbestos case, a plaintiff must meet the following standard:

In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper [as to a manufacturer] when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury.

*Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50, 52 (1988) (citations omitted).

Whether direct or circumstantial evidence is relied upon, our inquiry, under a motion for summary judgment [filed by a manufacturer], must be whether plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant.

*Id.* at 53 (citations omitted).

¶ 13 The plaintiff in *Eckenrod* died of lung cancer. The medical community has not assigned any definitive factor or set of factors that cause lung cancer. In the present case, however, Appellant's decedent died of mesothelioma and not from lung cancer. Mesothelioma is "a cancer of the mesothelial tissue surrounding the lung, which is a rare disease with the exception of those exposed to asbestos." *Sporio v. W.C.A.B. (Songer Construction)*, 553 Pa. 44, 48, 717 A.2d 525, 527 (1998). *See also* CancerWeb *at* http://cancerweb. ncl.ac.uk/cgi-bin/omd?query=mesothelioma & action=Search+OMD, last visited 6/3/02 (mesothelioma is a malignant tumor caused by exposure to asbestos fibers). In contrast to the plaintiff in *Eckenrod*, Mr. Gutteridge died of a disease which is medically attributable specifically to exposure to asbestos or asbestine products.

¶ 14 Our case law includes no requirement that a plaintiff who suffers a compensable asbestos related injury must establish the specific role played by each individual asbestos fiber within the body. *Lonasco v. A–Best Products Co.*, 757 A.2d 367, 375 (Pa.Super.2000), *appeal denied*, 566 Pa. 645, 781 A.2d 145 (2001). "Instead, in order to make out a *prima facie* case, it is well established that the plaintiff must present evidence that he inhaled asbestos fibers shed by the specific manufacturer's product." *Id.* at 375–76 (italics added). However, the plaintiff must establish more than the mere presence of asbestos in the workplace; he must prove that he worked in a vicinity in which a specific manufacturer's product was used. *Id.* at 376.

¶ 15 The nexus between a specific asbestos product and a plaintiff's medical condition may be supplied by a variety of direct and circumstantial evidence. *Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 207 (1991), *appeal denied*, 530 Pa. 644, 607 A.2d 254 (1992). The testimony of any witness with knowl-

edge regarding the plaintiff's workplace and his or her exposure to a defendant's asbestos-containing products is admissible when probative. *Id.* In the present case, Mr. Gutteridge died before he could be deposed. However, even when the plaintiff himself cannot identify specific products manufactured by asbestos defendants, the testimony of co-workers is admissible to establish that he worked in close proximity to the asbestos products in question. *See, e.g., Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 574 A.2d 1084, 1091–92 (1990).

¶ 16 We have considered carefully the arguments and averments advanced by Appellant as well as the response offered by Hercules and Pecora. *See* Appellant's Brief at 7–13; Appellee's Brief (Hercules) at 7–17; Appellee's Brief (Pecora) at 3–9. Moreover, we have scrutinized the certified record with special reference to those portions cited by Appellant and by Hercules and Pecora in their briefs. Frank Corvino's deposition testimony established that he worked at the Reading Terminal from 1952 until 1984. Deposition (Frank Corvino), 9/13/99, at 11. Mr. Corvino used Hercules and Pecora asbestos products in this location, and sanded them, thereby producing asbestos dust. *Id.* at 32–34, 60. Over objection, Mr. Corvino stated that there was no possible way a telephone worker (such as Mr. Gutteridge) could have been in his vicinity during the years 1970 to 1977 and not have inhaled asbestos dust from products produced by Hercules and Pecora. *Id.* at 83–85.

¶ 17 Mr. Corvino had no memory of meeting or working with Mr. Gutteridge. However, he remembered working near Alfonso Holloway, and with people working with Mr. Holloway, in the basement of the Reading Terminal between the years 1970 and 1977. Affidavit of Frank Corvino, 9/15/99. Mr. Corvino's affidavit also avers that Mr. Holloway and anyone working with him were exposed to the asbestos products and dust discussed in his deposition of September 13, 1999. *Id.,* § 4. Alfonso Holloway testified on deposition that, beginning in 1970, he and Mr. Gutteridge worked in the Reading Terminal installing telephone systems, running cable, and drilling holes in the walls to change equipment. Deposition (Alfonso Holloway), 9/1/99, at 14–17. Mr. Holloway stated that he worked with Mr. Gutteridge in the Reading Terminal for seven or eight years, between 1970 to 1976 or 1977. *Id.* at 14–15.

¶ 18 Even disregarding the deposition testimony of Frank Corvino to which objection was taken, the certified record shows that Appellant produced evidence sufficient to survive the motions for summary judgment under the pertinent legal standards. The depositions and affidavits of record indicate that, during the years 1970 to 1976 or 1977, Mr. Gutteridge worked with Alfonso Holloway at the Reading Terminal in close proximity to locations at which Mr. Corvino produced asbestos dust from products manufactured by Hercules and Pecora. The fact that Hercules and Pecora may have elicited contradictory testimony from these witnesses or from others merely creates a question of material fact indicating that summary judgment is inappropriate. *See Shroeder v. Commonwealth, DOT,* 551 Pa. 243, 247, 710 A.2d 23, 25 (1998) (oral testimony alone, either through testimonial affidavits or depositions, of the moving party or the moving party's witnesses, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact). Under these circumstances, we cannot agree with the trial court that the moving parties (Hercules and Pecora) satisfied their burden of proving that no genuine issues of material fact exist. *See Potter,* 762 A.2d at 1117–18

(explaining that all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party). It thus appears that Appellant produced evidence sufficient to withstand the motions for summary judgment filed by Hercules and Pecora, and that the trial court erred in granting these motions.

¶ 19 Appellant's remaining issues concern PECO's liability, as a landowner, for injuries to Mr. Gutteridge that allegedly occurred on PECO property. These claims sound in negligence rather than in strict liability. Appellant does not contend that PECO is liable as a manufacturer or purveyor of a defective or dangerous product. Rather, Appellant argues that PECO knew there was a dangerous condition on its property, *i.e.,* asbestos contamination, and that PECO breached its duty of care as an owner of land by failing to remediate that condition and to warn Mr. Gutteridge of both the condition's existence and the ramifications of asbestos contamination.

¶ 20 Appellant's second and third enumerated claims center on PECO's purported failure to satisfy its duty of care as a landowner. The fourth issue concerns the proper standard of review to be applied to the second and third arguments, and the fifth claim is that the trial court erred in failing to consider circumstantial evidence. Because these contentions are intertwined, we shall consider them together rather than separately.

¶ 21 We have already resolved Appellant's fifth claim. As noted above, in determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party, and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Potter,* 762 A.2d at 1117–18. The trial court must examine the pleadings, depositions, answers to interrogatories, ad-

missions of record and submitted affidavits to ascertain whether they demonstrate, in sum or in part, that the moving party is entitled to judgment as a matter of law. *Id.* at 1117. The trial court may only grant summary judgment when the facts are so clear that reasonable minds cannot differ as to the moving party's right to relief. *Basile,* 563 Pa. at 365, 761 A.2d at 1118. Thus, if the clear import of the record before the trial court raises a question of material fact, summary judgment is not proper.

¶ 22 The next question that must be settled is the proper legal standard to apply. The trial court employed the *Eckenrod* standard and found that it could draw no reasonable inference "that Mr. Gutteridge was ever exposed to a PECO product." Trial Court Opinion, 2/27/01, at 7. However, Appellant has never claimed that PECO is liable as a manufacturer or purveyor of asbestos products. Appellant predicates her allegations of negligence on PECO's status as a landowner. Thus, it is readily apparent that her claims against PECO cannot be analyzed under the standard set forth in *Eckenrod* for the resolution of strict liability claims against an asbestos manufacturer.

¶ 23 A viable cause of action for negligence must demonstrate only four elements: (1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risks; (2) failure on the part of the defendant to conform to that standard of conduct, *i.e.,* a breach of duty; (3) a reasonably close causal connection between the breach of duty and the injury sustained; and (4) actual loss or damages that result from the breach. *Ney v. Axelrod,* 723 A.2d 719, 721 (Pa.Super.1999). While the necessity of demonstrating a causal nexus is analogous to the *Eckenrod*

mandate of proving that a particular manufacturer's products caused the claimant's damages, the requirements are not identical.

¶ 24 To recover damages in a negligence action, as opposed to obtaining recovery on a strict liability asbestos claim, a plaintiff must establish that a particular defendant's negligence was the proximate cause of his or her injuries. *Skipworth by Williams v. Lead Industries Ass'n, Inc.*, 547 Pa. 224, 231, 690 A.2d 169, 172 (1997). "Cause in fact" or "physical cause" is not the same thing as "proximate cause" or "legal cause." *Whitner v. Von Hintz*, 437 Pa. 448, 459, 263 A.2d 889, 895 (1970). Proximate causation is found when wrongful conduct is a "substantial factor" in bringing about the specific harm incurred. *Amarhanov v. Fassel*, 442 Pa.Super. 111, 658 A.2d 808, 810 (1995). Whether a party's conduct has been a substantial factor in causing injury to another is ordinarily a question of fact for the jury. *Gravlin v. Fredavid Builders and Developers*, 450 Pa.Super. 655, 677 A.2d 1235, 1238 (1996). The matter may be removed from the jury's consideration only when it is clear that reasonable minds cannot differ on the issue. *Id.*

¶ 25 The mere fact an accident occurred does not entitle the injured person to a verdict. *Ney*, 723 A.2d at 721. A plaintiff must show that a defendant owed a duty of care, and that this duty was breached. *Id.* Indeed, the issue of whether the defendant owed a duty of care to the plaintiff is the primary question in a negligence suit. *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 552, 756 A.2d 1166, 1168 (2000). "In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered." *Id.* at 552, 756 A.2d at 1168–1169 (quotation marks and ellipses omitted). The legal concept of duty is rooted in "often amorphous public policy considerations, which may include our perception of history, morals justice and society." *Id.* at 553, 756 A.2d at 1169.

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the [over all] public interest in the proposed solution.

*Id.*

¶ 26 The standard of care a possessor of land owes to one who enters upon the land depends upon whether the latter is a trespasser, licensee, or invitee. *Emge v. Hagosky*, 712 A.2d 315, 317 (Pa.Super.1998). Employees of independent contractors, such as Mr. Gutteridge, are "invitees" who fall within the classification of "business visitors." *Darrah v. Jones & Laughlin Steel Corporation*, 397 Pa. 334, 338, 155 A.2d 201, 202 (1959); *Straight v. B.F. Goodrich Co.*, 354 Pa. 391, 394, 47 A.2d 605, 606 (1946). Pennsylvania law defines "invitee" as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly

connected with business dealings with the possessor of land.

*Updyke v. BP Oil Co.*, 717 A.2d 546, 549 (Pa.Super.1998). Our law uses the terms "business visitor" and "business invitee" almost synonymously. *Compare Emge,* 712 A.2d at 317 ("A business invitee is a person who is invited to enter or remain on the land of another for a purpose directly or indirectly connected with business dealings with the possessor of the land.") *with Straight,* 354 Pa. at 393–94, 47 A.2d at 606 (the appellation business visitor "is not limited to those coming upon the land for a purpose directly or indirectly connected with the business conducted thereon by the possessor, but includes as well those coming upon the land for a purpose connected with their own business which itself is directly or indirectly connected with a purpose for which the possessor uses the land," for example, a workman who makes repairs).

 ¶ 27 PECO concedes that Mr. Gutteridge was a business visitor on its property. PECO's Brief at 16. The duty of care owed to a business invitee (or business visitor) is the highest duty owed to any entrant upon land. *Emge,* 712 A.2d at 317. The landowner must protect an invitee not only against known dangers, but also against those which might be discovered with reasonable care. *Id.* Our case law sets forth the duty that a possessor of land owes to business invitees as follows:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Summers v. Giant Food Stores, Inc.,* 743 A.2d 498, 506 (Pa.Super.1999) (*en banc*), *appeal denied,* 564 Pa. 713, 764 A.2d 1071 (2001).

 ¶ 28 Pennsylvania law imposes no general duty on property owners to prepare and maintain a safe building for the benefit of a contractor's employees who are working on that building. *Mentzer v. Ognibene,* 408 Pa.Super. 578, 597 A.2d 604, 608 (1991). Rather, our law generally insulates property owners from liability for the negligence of independent contractors and places responsibility for the protection of the contractor's employees on the contractor and the employees themselves. *Id.* at 609. Nevertheless, as noted above, a landowner must protect an invitee not only against known dangers, but also against those which might be discovered with reasonable care. *Emge,* 712 A.2d at 317. Additionally, certain exceptions exist to the general rule that otherwise would limit the property owner's liability. In the present case, Appellant argues that both the "peculiar risk" doctrine and the "special knowledge" doctrine entitle her to relief.

 ¶ 29 The "peculiar risk" doctrine was endorsed by our Supreme Court when it adopted sections 416 and 427 of the Restatement (Second) of Torts in *Philadelphia Electric Co. v. James Julian, Inc.,* 425 Pa. 217, 228 A.2d 669 (1967). A "peculiar risk" (or "special danger") exists when: (1) a risk is foreseeable to the employer of an independent contractor at the time the contract is executed (that is, if a reasonable person in the position of the employer would foresee the risk and recognize the need to take special measures); and (2)

the risk is different from the usual and ordinary risk associated with the general type of work done (that is, the specific project or task chosen by the employer involves circumstances that are substantially out-of-the ordinary). *Ortiz v. Ra–El Development Corp.*, 365 Pa.Super. 48, 528 A.2d 1355, 1358 (1987). The peculiar risk doctrine appears not to apply to the present case because no factual allegations indicate that Mr. Gutteridge was an employee of PECO, or that the contractor or subcontractor for which he worked was engaged on behalf of PECO.

¶ 30 Appellant's amended complaint explicitly states that Mr. Gutteridge was "not employed by Philadelphia Electric Co." but rather that he was "employed on the grounds of one or more of its [PECO's] facilities." Amended Complaint, 11/18/97, ¶ 10(n). Appellant's complaint incorporates by reference averments in several other complaints, as well as allegations contained in the Master Complaint filed in compliance with established procedure in the Philadelphia Court of Common Pleas. *Id.* at ¶ 8. These pleadings and complaints have not been made a part of the record certified to this Court in conjunction with the present appeal. We therefore have no copy of these pleadings. It is possible that these other complaints contain averments concerning PECO's status as employer and of AT & T as a contractor or subcontractor. While it is required practice in the trial court to incorporate other asbestos-related complaints by reference, if no copies of such materials are provided to this Court, then we lack any basis on which to evaluate averments set forth in the missing documentation.

¶ 31 It is well settled that this Court may act only in consideration of matter contained within the certified record. *Humphreys v. DeRoss*, 737 A.2d 775, 781 (Pa.Super.1999) (*en banc*), *reversed on other grounds*, 567 Pa. 614, 790 A.2d 281 (2002). *See Murphy v. Murphy*, 715 A.2d 477, 478 (Pa.Super.1998) (explaining that relief cannot be predicated on factual averments not of record). Appellant has not pointed us to any matter of record that would indicate that PECO stood in the position of employer to Mr. Gutteridge. Indeed, Appellant's amended complaint states otherwise. Thus, we cannot disagree with the trial court's conclusion that the pleadings do not support the inference that PECO, in its capacity as landowner, could be liable to Appellant under the peculiar risk doctrine.

¶ 32 Nevertheless, a landowner acting solely in its capacity as landowner, "owes a duty to warn an unknowing independent contractor of existing dangerous conditions on the landowner's premises where such conditions are known or discoverable to the owner." *Colloi v. Philadelphia Electric Co.*, 332 Pa.Super. 284, 481 A.2d 616, 619 (1984). The landowner's "duty to warn is owed irrespective of whether the independent contractor exercises full control over the work and premises entrusted to him." *Id.* at 619–20. However, an owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty to the employees of the independent contractor with respect to an obviously dangerous condition on that portion of the land in the possession of the contractor. *Id.* at 620. Furthermore, the employer of an independent contractor has no duty to warn either the contractor or his employees of a condition that is at least as obvious to them as it is to him. *Colloi*, 481 A.2d at 620. The question of whether a landowner owes a duty to warn an independent contractor of dangerous conditions on the premises turns on whether the owner possesses "superior knowledge" or information which places him in a better position

to appreciate the risk posed to the contractor or his employees by the dangerous conditions. *Id.*

¶ 33 *Colloi* poses two questions in the present case: (1) did PECO possess superior knowledge concerning the existence of asbestos contamination in Mr. Gutteridge's workplace? and (2) was PECO in a better position than Mr. Gutteridge and his employer to appreciate the danger posed by the asbestos contamination? The essence of Appellant's argument is that PECO both possessed superior knowledge of the dangerous condition on its property and that PECO was in a better position to appreciate the risk posed by the asbestos. Appellant contends that despite its duty of care, PECO neither remediated the condition nor provided any warning to Mr. Gutteridge of this dangerous condition. PECO responds that it had no duty to warn because it was a landowner out of possession at the relevant times. This defense is not available to counter an allegation of "superior knowledge." A landowner's duty to warn exists irrespective of whether an independent contractor exercises full control over the premises if the landowner possesses "superior knowledge," which places him in a better position to appreciate risks posed by a dangerous condition. *Colloi,* 481 A.2d at 619–20.

¶ 34 Frank Strom testified that he worked for Bell Telephone Company for forty-one years, beginning in the 1950's through the 1980's. Deposition of Frank Strom, 11/10/00, at 8–9. Mr. Strom stated that he knew Mr. Gutteridge, that they worked for the telephone company at the same time, and that they did the same type of work in the same type of locations. *Id.* at 10–12. Mr. Strom further testified that he and Mr. Gutteridge, as telephone workers, were exposed to asbestos products when they handled renovation work in commercial buildings. *Id.* at 13–14.

The witness stated that telephone workers encountered asbestos products in ceiling tiles for drop ceilings, pipe coverings, adhesives, glues, paints, fabrics, floor coverings, decorative wall and ceiling "sprays," boiler covering, boiler insulation, wall insulation, and insulation. *Id.* at 16–18, 38–42. Mr. Strom testified at length concerning the nature of the tasks to which he and other telephone workers performing the same function would be assigned. He explained how these tasks brought them in contact with asbestos products and asbestos dust, and also discussed the frequency of such contact. *Id.* at 19–42, 55–58, 59–71. Mr. Strom named specific asbestos manufacturers who supplied products that he remembered. *Id.* at 26, 28, 32, 55–56. Additionally, Mr. Strom detailed specific buildings and locations in which the exposure to asbestos occurred. *See id.* at 45–50 (naming facilities at which he and other telephone company employees performed work and were exposed to asbestos, including the "old Gimbel Building," the Victory Building, the Philadelphia Savings Fund Society building, the Reading Terminal, the PECO building at South Tenth Street, the PECO steam plant on Ludlow Street, the Edison Steam Plant (identified as a PECO facility), the Willow Steam Plant (identified as a PECO facility)).

¶ 35 Mr. Strom testified that he remembered Mr. Gutteridge being present at PECO's Willow facility and stated that the two had contact with asbestos-containing products at that location. *Id.* at 47–48. He also testified that nobody from PECO offered him a respirator or mask while working with asbestos-containing products. *Id.* at 50–51. Mr. Strom did not observe Mr. Gutteridge wearing a respirator or mask when working with asbestos-containing products in PECO facilities. *Id.* at 51–52. Mr. Strom also remembered observing Mr. Gutteridge working in both

PECO's Tenth Street facility and at their Edison facility. *Id.* at 75–80, 85–86. While Mr. Strom stated that he never worked "with" Mr. Gutteridge, the witness was quite clear that he observed Mr. Gutteridge on the job at the above referenced specific locations. *Id.* at 47–52, 75–80, 85–86, 150–52.

¶ 36 Mr. Strom could not state with certainty that the Willow location definitely was contaminated with asbestos. *Id.* at 82. He also testified that when he worked in the Philadelphia Navy Yard, he was informed that asbestos was potentially dangerous. *Id.* at 84. Although he was of the opinion that "everybody" at the Navy Yard knew asbestos was dangerous, he never averred that people who worked in PECO facilities shared the purportedly universal Navy Yard knowledge. *See id.* at 83–84.

¶ 37 Joseph Marlin went to work for PECO in 1953 and remained in PECO's employ for thirty-six years. Deposition of Joseph R. Marlin, 7/18/90, at 19–20. Mr. Marlin stated that he worked in the Willow Steam Plant, as well as at the Edison Steam Plant. *Id.* at 21. The witness testified that during the time he worked at these facilities, people used asbestos-containing products of various sorts. *Id.* at 23–31. Mr. Marlin explicitly stated that the work created asbestos dust, and that people present within the facilities breathed the dust. *Id.* at 98–99.

¶ 38 Edgar Grace testified that he worked for PECO as a steam heat helper from July to November of 1967, before entering the army. Deposition of Edgar G. Grace, Jr., 3/29/00, at 32–33. After his honorable discharge from the armed services in 1970, Mr. Grace resumed working for PECO, first as a steam heat helper and later as a stoker operator. *Id.* at 47, 49. The witness worked at the Willow Steam Plant and at the Edison Steam Plant in the

1970's. *Id.* at 47–48. Mr. Grace described in some detail the types of asbestos products used in these facilities during this time frame. *Id.* at 36–37, 39–46. The witness stated that although there was some awareness that asbestos products might be a problem, it was several years before PECO got "into the training aspect and things like that." *Id.* at 103. The workers did not start wearing masks until the 1980's. *Id.* at 103. Mr. Grace's testimony specifically referred to the lack of remediation and warning that occurred at the Willow Steam Plant and at the Edison Steam Plant. *Id.*

¶ 39 When all the above deposition testimony is considered, it is clear that Appellant was exposed to asbestos dust on properties owned by PECO. Affidavits of record taken from Richard A. Lemen, Ph. D., and James E. Girard, Ph.D., the former chairman of the Department of Chemistry at American University, establish the causative effect of exposure to asbestos and asbestos products with regard to mesothelioma. *See* Affidavit of Richard A. Lemen dated 9/28/00 and Affidavit of James E. Girard dated 11/14/00. While PECO may dispute the conclusions reached by Appellant's experts, credibility and the weight to be assigned to evidence are not proper considerations at the summary judgment stage of proceedings. *Resolution Trust Corp.,* 536 Pa. at 225, 638 A.2d at 975; *Rauch v. Mike–Mayer,* 783 A.2d 815, 823 n. 6 (Pa.Super.2001), *appeal denied,* 568 Pa. 634, 793 A.2d 909 (2002). As discussed above, Mr. Gutteridge died of mesothelioma, a disease caused by exposure to asbestos and asbestos products. We have ascertained that Appellant produced evidence supporting the following conclusions: (1) PECO's duty of care to Mr. Gutteridge was that of a landowner to a business invitee; (2) Mr. Gutteridge was exposed to asbestos on

premises owned by PECO; and (3) Mr. Gutteridge died of a disease caused by exposure to asbestos. The remaining question is whether PECO violated its duty of care to Mr. Gutteridge.

¶ 40 A landowner, acting solely in its capacity as landowner, "owes a duty to warn an unknowing independent contractor of existing dangerous conditions on the landowner's premises where such conditions are known or discoverable to the owner." *Colloi*, 481 A.2d at 619. As noted above, the questions posed by *Colloi* are two-fold: (1) did PECO possess superior knowledge concerning the existence of asbestos contamination in Mr. Gutteridge's workplace? and (2) was PECO in a better position than Mr. Gutteridge and his employer to appreciate the danger posed by the asbestos contamination? PECO urges us to conclude that the answer to both questions is "no."

¶ 41 In support of its position, PECO cites to several Pennsylvania cases that exonerated landowners of any responsibility to warn of obvious dangers in the workplace. However, the crux of Appellant's argument is that the danger faced by Mr. Gutteridge was not obvious to him. Dr. Girard's affidavit indicates that even asbestos dust which is invisible to the naked eye can provide exposure to asbestos fibers sufficient to cause mesothelioma. Affidavit of James E. Girard, 11/14/00, at ¶¶ 4–11. By definition, invisible dust is not an obvious danger. Dr. Lemen's affidavit indicates that scientific literature indicated as early as 1935 that asbestos posed peculiar workplace hazards. Affidavit of Richard A. Lemen, 9/28/00, at ¶ 11–12 (referencing scientific reports published in 1935 and in 1965). Furthermore, bulletins issued by the Commonwealth of Pennsylvania alerted public utilities (such as PECO) to the hazards of asbestos, particularly mesothelioma, by the year 1960. *Id.*

at ¶ 12. The bulletins were sent to public utilities to alert them to the hazards of asbestos that required protection of employees and contract workers, such as Mr. Gutteridge. *Id.* at ¶ 15. Based on his review of the scientific literature and the warning bulletins issued by Pennsylvania, Dr. Lemen concluded that PECO should have acted to protect contractors, such as Mr. Gutteridge, from the dangers of exposure to asbestos. *Id.* at ¶ 17.

¶ 42 While PECO is free to dispute the averments and conclusions reached by Drs. Girard and Lemen, any such argument serves merely to place material matters of fact into dispute. In this vein, PECO argues that any hazards posed by asbestos in the workplace, whether in the form of visible or invisible dust, were equally well known to Mr. Gutteridge's employer, AT & T, as it was to PECO. The question of whether AT & T knew of the danger and failed to warn Mr. Gutteridge poses an additional material factual dispute. As detailed above, Mr. Strom testified that it was general knowledge at the naval yard that asbestos was dangerous. However, PECO has failed to substantiate that common knowledge at the naval yard was also common knowledge on PECO property.

¶ 43 In light of the above, we conclude that PECO is not liable to Appellant under the "peculiar risk" doctrine. However, we have determined that Appellant averred facts sufficient to place into material dispute the question of whether PECO, in its capacity as landowner and not employer, violated its duty to Mr. Gutteridge, a business invitee, because it possessed superior knowledge concerning the hazards posed by invisible asbestos contamination. Consequently, we find that the trial court erred in granting summary judgment to PECO.

¶ 44 The orders granting summary judgment to Hercules, Pecora and PECO, and marking the case settled prior to trial, are reversed. The case is remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.