**Theresa WRIGHT, Executrix of the Estate of Raymond Wright and in Her Own Right, Appellant**

**v.**

**ALLIED SIGNAL, INC., Asten Group, Inc., A.W. Chesterton Inc., Borg–Warner Corp., Certain–Teed Corp., Chrysler Corp., Crane Co., Crane Packing, Crown Cork & Seal Co., Inc., Ford Motor Co., Foster Wheeler Corp., Garlock, Inc., General Electric Co., General Motors Corp., Goulds Pumps, Inc., Green Tweed & Co., Inc., Hopeman Brothers, Inc., Metropolitan Life Insurance Co., Nosroc Corp., Owens–**

---

Illinois, Inc., Pars Manufacturing Co., Pecora Corp., Pep Boys, Rapid American Corp., Riley Stoker Corp., Selby Battersby, Union Carbide Corp., Westinghouse Electric Corp., Weil McLain Co., Appellees.

Superior Court of Pennsylvania.

Argued Sept. 17, 2008.

Filed Dec. 19, 2008.

Steven J. Cooperstein, Philadelphia, for appellant.

Peter J. Lynch, Philadelphia, for Asten, appellee.

BEFORE: BENDER, DONOHUE, and FREEDBERG, JJ.

OPINION BY FREEDBERG, J.:

¶ 1 In this asbestos personal injury action, Appellant Theresa Wright, individually and as executrix of the estate of her late husband Raymond Wright, appeals from an order granting summary judgment in favor of Asten Johnson, Inc., successor to Asten Group, Inc. ("Asten"). Raymond Wright was employed as an electronic engineer with Scott Paper and on occasion worked in the paper manufacturing plant in Chester, Pennsylvania. Asten manufactured asbestos-containing dryer felts used in the paper manufacturing process. We conclude that there is sufficient record evidence to withstand summary judgment. Accordingly, we reverse and remand.

¶ 2 In January of 2005, Raymond Wright was diagnosed with mesothelioma, a cancer of the mesothelial tissue surrounding the lung caused by exposure to asbestos. He and his wife, Theresa Wright, filed suit against a number of parties, including Asten, alleging that Mr. Wright's workplace exposure to asbestos caused his mesothelioma. During the pendency of the action, Mr. Wright died from the disease. Asten ultimately moved for summary judgment contending that Appellant failed to adduce sufficient evidence to establish that Mr. Wright inhaled asbestos fibers shed from Asten dryer felts. The trial court granted summary judgment for Asten by order dated July 9, 2007, and docketed July 10, 2007. Appellant filed notice of appeal on July 19, 2007, and Appellant thereafter filed a statement of errors in compliance with Pennsylvania Rule of Appellate Pro-

cedure 1925. In turn, the trial court issued an opinion pursuant to Rule 1925.

■ ¶ 3 The posture of this appeal requires that we address the threshold issue of our jurisdiction to entertain the appeal. Appeal may be taken only from a final order, that is, an order that disposes of all claims and all parties. Pa.R.A.P. 341(a). A number of defendants remained of record following the trial court's grant of summary judgment for Asten. This fact appears to call into question the finality of the trial court's order granting summary judgment to Asten. However, the record reflects a July 16, 2007 trial court docket entry noting that this case was settled as to all remaining non-bankrupt parties, except the Manville Fund, but the case against the Manville fund was dismissed. "A trial court order declaring a case settled as to all remaining parties renders prior grants of summary judgment final for Rule 341 purposes, even if the prior orders entered disposed of fewer that all claims against all parties." *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 650 (Pa.Super.2002); *Harahan v. AC & S, Inc.*, 816 A.2d 296, 297 (Pa.Super.2003). In this case all parties are now settled, bankrupt, or dismissed by grant of summary judgment or otherwise. Consequently, the grant of summary judgment for Asten is a final order for appeal purposes and the present appeal is properly within our jurisdiction. *Gutteridge*, 804 A.2d at 650; *Harahan*, 816 A.2d at 297.

■ ¶ 4 Appellant raises a single issue for our consideration, namely, whether the trial court abused its discretion or committed an error of law in concluding that there was insufficient record evidence to establish that Mr. Wright was exposed to Asten's asbestos-containing dryer felt product. The issue calls upon us to review

whether the record evidence of exposure to asbestos-containing material was sufficient to meet the frequency, regularity, and proximity test of *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1988).

¶ 5 We review a grant of summary judgment under the following well-settled standards:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

> [O]n appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Gutteridge,* 804 A.2d at 651. (citations omitted)

¶ 6 To withstand a summary judgment motion in an asbestos case, a plaintiff must meet the following standard:

> In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury.

> Whether direct or circumstantial evidence is relied upon, our inquiry, under a motion for summary judgment, must be whether plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant. Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment by showing circumstantial evidence depends upon the frequency of the use of the product and the regularity of plaintiff's employment in proximity thereto.

*Eckenrod,* 544 A.2d at 52, 53. (citations omitted)

¶ 7 There is no requirement that a plaintiff who suffers an asbestos related injury must establish the specific role played by each individual asbestos fiber

within the body. *Gutteridge,* 804 A.2d at 652; *Lonasco v. A–Best Products Co.,* 757 A.2d 367, 375 (Pa.Super.2000). "Instead, in order to make out a *prima facie* case, it is well established that the plaintiff must present evidence that he inhaled asbestos fibers shed by the specific manufacturer's product." *Lonasco,* 757 A.2d at 375–76 (italics added). A plaintiff must, however, establish more than the mere presence of asbestos in the workplace. The plaintiff must establish that he worked in the vicinity of a specific manufacturer's product. *Gutteridge,* 804 A.2d at 652; *Lonasco,* 757 A.2d at 376.

¶ 8 The nexus between an asbestos product and plaintiff may be established by direct and circumstantial evidence. *Gutteridge,* 804 A.2d at 652; *Lilley v. Johns–Manville Corp.,* 408 Pa.Super. 83, 596 A.2d 203, 207 (1991). The testimony of a witness with knowledge relating to the plaintiff's workplace exposure to an asbestos-containing product is admissible when probative. *Gutteridge,* 804 A.2d at 652–653; *Lilley,* 596 A.2d at 207. Even when the plaintiff is not able to identify specific products manufactured by particular defendants, the testimony of co-workers is admissible to establish that the plaintiff worked in close proximity to the asbestos products in question. *Gutteridge,* 804 A.2d at 653; *Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 574 A.2d 1084, 1091–92 (1990).

¶ 9 The record before us discloses the following. Mr. Wright was employed as an electronic engineer in the research and development department of Scott Paper from 1958 to 1963. Mr. Wright's employment required him to be at Scott Paper manufacturing plants. Mr. Wright estimated that he spent one to two days out of every six months at Scott Paper's manufacturing plant in Chester, Pennsylvania. Mr. Wright recalled that while at the Chester plant asbestos "was flying around the room" from the rollers "as they manufactured the paper." Asked where the asbestos came from, Mr. Wright testified, "I think it was on the felts that they were running on." Mr. Wright did not specifically know whether the felts created dust, he did not specifically identify the manufacturer of the felts, and he did not specifically know at the time of his work at the plant that the felts contained asbestos. It should be noted that Mr. Wright acknowledged daily exposure to asbestos-containing products during a two year stint in the United States Navy, as well as exposure during instances that he performed brake work of his family's automobiles.

¶ 10 Beyond the testimony of Mr. Wright, the record contains the testimony of Albin Koronkiewicz. Mr. Koronkiewicz worked at Scott Paper from 1955 through 1992, and his entire career was spent working on the paper machines. Mr. Koronkiewicz knew that each of the eight paper machines included dryer felts made from asbestos, and that the machines ran almost constantly. When the machines ran they would create dust from the dryer felts. Mr. Koronkiewicz identified Asten as a manufacturer of the dryer felts in use at the Chester plant. The dryer felts contained a label with the Asten brand name and identifying the product as containing asbestos. Except for 30 to 60 day trials of other types of felts, all of the dryer felts in use at Chester were manufactured by Asten and contained asbestos. Mr. Koronkiewicz did not know Mr. Wright personally, but recognized him from a photograph as someone who would be in the Chester plant near the paper machines breathing dust from the dryer felts. There was no testimony indicating that Mr. Wright ever handled the dryer felts.

¶ 11 In entering summary judgment, the trial court concluded that Appellant failed to establish, either through direct or circumstantial evidence, that Mr. Wright in-

haled asbestos fibers from Asten's product. The trial court found Mr. Wright's testimony lacking because it put him in the plant only one or two days out of every six months; because he did not know whether the felts created dust; because he did not know if the felts contained asbestos; and because he did not know who manufactured the felts. The trial court also found Mr. Koronkiewicz's testimony lacking because the testimony disclosed a "tenuous" identification of Mr. Wright; because the testimony erroneously placed Mr. Wright at the Chester plant at a time prior to the commencement of Mr. Wright's work there in 1958; and because the testimony indicated that felts other than the Asten felts were used at the plant. In sum, the trial court found:

> Koronkiewicz testified that dryer felts from various manufacturers, not just Asten, were used at the Chester plant. Moreover, Plaintiff has failed to establish that [Mr. Wright] was present at the Chester plant with the frequency and regularity required by *Eckenrod* and its progeny. Koronkiewicz's testimony places [Mr. Wright] at the Chester plant for an indeterminate amount of time *before* he ever worked for Scott Paper and [Mr. Wright's] own testimony only established that he visited the plant at most between two to four days each of the five years he worked for Scott. Thus, at most [Mr. Wright] spent 20 days spread over a five year period at the Chester plant and there is no evidence that Asten dryer felts were in use on any of those 20 days.
>
> As Plaintiff's evidence fails to establish that [Mr. Wright] inhaled asbestos fibers shed from Asten's product on a regular basis, summary judgment was appropriate.

Trial Court 1925 Opinion, 1/7/08, at 7.

¶ 12 Our review of the record leads us to conclude that the trial court took an overly restrictive view of the evidence and the applicable legal standards at the summary judgment stage. In this regard, we note the following deposition testimony of Mr. Wright:

Q: Okay. What did Scott Paper make at its Chester facility?

A: They made toilet paper, roll of all types.

Q: How did they do that, did they use machinery?

A: Machinery. They run it wide rolls and they had a slush that they poured down to make the paper and in turn packed it up and do rolls or whatever they had to do.

Q: Okay. How often would you get to that Chester plant?

A: I'd say at least one every six months or so for a day or two.

Q: All right. And how long would you spend there?

A: A day or so at a time.

Q: The whole day?

A: Yes.

Q: When you were at the plant were you exposed asbestos materials?

A: It was flying around the room.

Q: Where would it come from?

A: From the rollers, from the—as they manufactured the paper.

Q: Where was asbestos on the rollers?

A: I would think it was on the felts that they were running on.

Deposition of Raymond Wright, 5/19/05, at 37–38.

¶ 13 In addition, we note the following deposition testimony of Mr. Koronkiewicz:

Q: When the machines function, do they function all day long?

A: 360.

Q: 360 meaning days?

A: Yes. The only time they would—the only time a paper machine would go down either for maintenance; or Christmastime which we would shut down, I think it was, 72 hours. And then at the same token, that is right, the dryer felts had to—the dryers had to run and the Yankee had to run to keep the belt dry. We would—your mill engineers used to do that. They were allowed to go home for Christmas. They would work over the Christmas holidays.

Deposition of Albin Koronkiewicz, 2/8/07, at 25.

Q: How many total machines were operating in the 50's and 60's at one time?

A: Eight.

Q: Eight?

A: (Witness nods head.)

Q: Did they all have dryer felts?

A: All had—

Q: They all had—

A: All had dryer felts.

Deposition of Albin Koronkiewicz, 2/8/07, at 27.

Q: How did the dryer felts get to the Scott Paper plant?

A: Well, I know they order them. And Asten or—well, all the felts basically are brought in by truck. Asten, Albany felt. And I thought there was another one, and I forgot what the name of that one is. It's been a long time for me.

Q: Okay. The one—do you remember Asten?

A: Oh, yes.

Deposition of Albin Koronkiewicz, 2/8/07, at 28.

Q: Would the dryer felts get dusty—

A: Oh, yeah.

Q:—after they were used?

A: Definitely.

Q: When the machines were actually running, if you were working around the machines, were you aware the dust was?

A: Oh, I was—you see dust everywhere. The reason—the reason for that, paper is going to get dusty. It would be just like a bakery. When you're making bread and dough and that, you got the flour in there. You realize the dust in there. It's basically the same thing.

Deposition of Albin Koronkiewicz, 2/8/07, at 30–31.

Q: Mr. Raymond Wright, the picture that you just identified, he didn't work on the paper machines themselves like you did?

A: No.

Q: Correct?

A: No.

Q: He would come to the plant on various occasions.

A: Yes. They would bring him in from Philadelphia.

Q: Okay. When he came into the plant, would he be around the paper machine?

A: Definitely.

Deposition of Albin Koronkiewicz, 2/8/07, at 35.

Q: When Ray Wright was in the plant, did he breathe the same air that you breathed?

A: Definitely.

Q: How close would Ray get to the machines, to the paper machines?

A: Oh, he would be right there.

Q: When—

A: Depending what he's doing on a paper mill, he's got to be right next to the machines. If—we had two machines this close.

Q: You're pointing to the walls.

A: To the walls.

Q: About 10 or 15 feet away.

A: Right. Well, maybe a little more.

Q: Okay.

A: Well, you had, for example, Number 12 machine was here. And you take five steps, and Number 14 was right next to it. Then you go by the wall. You've already got a wall there. Then you have two more machines. You had 7, 6, 8, and 11. Then you had a wall again. So there's four machines right in the same area. Then you had a single machine which was 10. 16 was a single machine with a wall in only one. Then you have—you had 15 and 17 with a wall.

Q: When Mr. Wright came into the plant with the machines running, would he have been exposed to the asbestos dryer felts from Asten?

[Object to the form.]

Q: You can answer that.

A: Definitely.

Q: All right. Would he breathe the same air from—

A: Yes.

Q: That you were breathing?

A: From any machine he walked to.

Q: Would he have been breathing the dust from Asten asbestos—

A: Yes.

Q:—dryer felts.

A: Sure.

[Object to form.]

A: Sure.

Q: Is there any way he could not have been breathing that?

A: Well, in them days, no way in hell.

Q: All right. Did you ever see Ray Wright wearing a mask or a respirator?

A: I never seen anybody wear a mask there until the late—late 80's. And that was on Number 19 mill, and that machine was just built. And they used to do high pressure—high-pressure guns.

Q: The Asten dryer felts you told us about, were they there all through the 50's, 60's, and 70's?

A: (Witness nods head.) Yes they were. And some of it—well, they shut down some of the paper mills. You didn't have the eight of them there anymore. But the machines that were left, they still had dryer felt.

Deposition of Albin Koronkiewicz, 2/8/07, at 37–39.

Q: Well, when do you believe that an asbestos-containing felt made by Asten was first used at Scott? Do you know?

A: When I first got there.

Q: Okay. What's the basis for your opinion?

A: A little piece of paper that said Asten Hills, Asten Felt Company or something. Asbestosis or—I didn't know—I didn't know that asbestos was a problem.

Q: Okay. So when you—

A: Nobody did as far as I know.

Q: Are you saying that there was a tag that was attached to it that said it had asbestos?

A: I'm positive it said asbestos.

Deposition of Albin Koronkiewicz, 2/8/07, at 61.

Q: So you used other dryer felt company's products?

A: I presume we did because they're going to give it to you for nothing.

Q: Okay.

A: So we'll try it.

Q: So you recall that.

A: We'll try it for 30 or 60 days.

Q: And you did—

A: And then see how you like it.

Q: And did that continue forward?

A: I'm not the supervisor. That goes to a higher echelon.

Deposition of Albin Koronkiewicz, 2/8/07, at 64.

> Q: Remembering what you said about the dryer felts before, if he were walking among the paper machines when they were working and he was walking among the paper machines when they had asbestos-containing Asten dryer felts, would he have breathed the dust from the dryer felts?
>
> A: Definitely.

Deposition of Albin Koronkiewicz, 2/8/07, at 89.

¶ 14 The trial court found the evidence in this case analogous to the evidence in *Wilson v. A.P. Green Industries, Inc.*, 807 A.2d 922 (Pa.Super.2002). We disagree. In *Wilson*, the lone product identification witness testified at deposition that she was unable to say whether or not she saw the plaintiff use the cement product at issue. The witness stated, "I did not really know what they were using...." Plaintiff's counsel then asked the following questions:

> Q: Do you believe—is what you're saying here to me then is that at one time or another during the year people would use this Flintkote Fibrex Cement around you and Dolly Chase?
>
> [Objection.]
>
> A: That's what I'm saying. That's what I'm saying.
>
> Q: And do you think that this product, this fibrex cement that they were using, made dust?
>
> [Objection]
>
> A: All of the products that I have stated, all of them, made dust.

*Wilson*, 807 A.2d at 926, n. 1.

¶ 15 In *Wilson*, this Court described this quoted exchange and the evidence in that case as follows:

> Despite Ms. Usher's obvious inability to remember the use of these products around her or decedent, appellant's counsel mischaracterized her answer and asked two leading questions. The answers she provided were completely opposite the statements she made without prompting just moments earlier. Answers to such inappropriate leading questions are not admissible and may not serve as the basis for surviving a summary judgment motion. The trial court did not err, therefore, in refusing to consider this portion of Ms. Usher's deposition.
>
> Since appellant offered no direct evidence that decedent inhaled any asbestos-containing Flintkote product, the court correctly ruled that she needed to satisfy the *Eckenrod* standard, *i.e.*, that decedent worked in proximity to such a product on a regular basis. Ms. Usher's testimony clearly failed to establish this type of exposure, and summary judgment was proper.
>
> Even if Ms. Usher's answers to counsel's leading questions were admissible, we would rule that her testimony, when taken as a whole, fails to demonstrate that decedent inhaled fibers from Flintkote Fibrex Cement. Ms. Usher stated that, at most, decedent was exposed to dust from appellee's product "at one time or another." This testimony is far too vague and unsubstantiated to prove even one instance of exposure to the product, let alone to establish that decedent regularly worked in proximity to it. The inadequacy of this testimony becomes even clearer when we consider Ms. Usher's previous response that she could not remember anyone using the Flintkote product around decedent. When a plaintiff's lone witness contradicts herself in this fashion, such testimony cannot establish a genuine issue of material fact.

*Wilson*, 807 A.2d at 926–927 (citations omitted).

¶ 16 It is our view that *Wilson* stands for the very obvious proposition that where the lone product identification witness is unable to identify the offending product, summary judgment is proper, and counsel cannot save the case by forming a question that mischaracterizes the witness' testimony and simply secures the obliging acquiescence of the witness.

¶ 17 In applying the *Eckenrod* frequency, regularity, and proximity test, it is prudent to understand the limits of *Eckenrod.* In *Eckenrod,* three coworkers supplied affidavits indicating that they worked with the deceased plaintiff and that the deceased plaintiff was exposed to asbestos products, but the affidavits "did not elaborate on the nature or length of the exposure or the brand of the products available." *Eckenrod,* 544 A.2d at 52. Moreover, "while the affidavits admitted that Mr. Eckenrod was 'exposed to' asbestos products, none clarified the proximity of the products to the workers or that the appellees were the manufacturers/suppliers of the products being used." *Eckenrod,* 544 A.2d at 52–53. Importantly, in *Eckenrod,* "the only testimony as to the identification of *any* of the products came from the depositions of distributors of the asbestos products and one main plant storeroom employee at B & W. Each of these depositions indicates that various appellees sold asbestos products to B & W, but do not establish where the specific product was used or that Mr. Eckenrod came into contact with an identifiable product." *Eckenrod,* 544 A.2d at 53. Confronted with evidence of little more than proof that the offending product was shipped into the plant, we found that there was "not even a reasonable inference that appellant was exposed to appellees' asbestos products." *Eckenrod,* 544 A.2d at 53.

¶ 18 The record evidence here surpasses the evidence in *Wilson* and *Eckenrod.* We have little trouble concluding that, viewing the record in the light most favorable to Appellant, and resolving all doubts against Asten, the evidence established that the Asten product was frequently used in the Chester plant, that Mr. Wright regularly worked in proximity to the Asten product, and that Mr. Wright's contact with the product was of a nature to give rise to a reasonable inference that he inhaled asbestos fibers from the product. *See Coward v. Owens–Corning,* 729 A.2d 614, 622–623 (Pa.Super.1999) (evidence must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers shed from the product) *citing Eckenrod,* 544 A.2d at 52; *Samarin v. GAF Corp.,* 391 Pa.Super. 340, 571 A.2d 398, 405 (1989).

¶ 19 We do nothing to diminish or question the frequency, regularity, and proximity test of *Eckenrod,* a test that our Supreme Court very recently, and for the first time ever, lended its express imprimatur to in *Gregg v. V–J Auto Parts Company,* 596 Pa. 274, 943 A.2d 216 (2007). In *Gregg,* the Supreme Court stated:

In this regard, the decision in *Tragarz v. Keene Corp.,* 980 F.2d 411 (7th Cir. 1992), referenced by both parties, provides helpful guidance concerning the application of the frequency, regularity, proximity factors in asbestos litigation. *Tragarz* explains that these criteria do not establish a rigid standard with an absolute threshold necessary to support liability. Rather, they are to be applied in an evaluative fashion as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is

absent on account of only casual or minimal exposure to the defendant's product. Further, *Tragarz* suggests that the application of the test should be tailored to the facts and circumstances of the case, such that, for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. Similarly, under *Tragarz,* the frequency and regularity prongs become "somewhat less cumbersome" in cases involving diseases that the plaintiff's competent medical evidence indicates can develop after only minor exposures to asbestos fibers.

We agree with the *Tragarz* court's approach and adopt it here.

*Gregg,* 943 A.2d at 225–226 (internal citations omitted).

¶ 20 The Supreme Court concluded with the following observation in *Gregg:*

> In summary, we believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Gregg,* 943 A.2d at 227.

¶ 21 In a recent *en banc* decision, this Court applied *Gregg* and *Eckenrod* to uphold a grant of summary judgment in an asbestos exposure case involving a lung cancer death. *Tarzia v. American Standard,* 952 A.2d 1170 (Pa.Super.2008) (*en banc* ). Unlike the instant case, in *Tarzia* there was "nothing in the record to show what company manufactured any of the brake shoes Tarzia came into contact with," and there was "nothing in the record to show whether any of the brake shoes Tarzia came into contact with even contained asbestos." *Tarzia,* 952 A.2d at 1174. Under those particular circumstances, this Court concluded that a plaintiff "cannot demonstrate with any degree of confidence or certainty the frequency, regularity or proximity that Tarzia was exposed to any product from Cobra/American Standard." *Tarzia,* 952 A.2d at 1174.

¶ 22 We conclude that on the record evidence before us concerning the frequency, regularity, and proximity of Mr. Wright's asserted exposure to the Asten dryer felt product a jury would be entitled to make the necessary inference of a sufficient causal connection between the Asten dryer felt product and Mr. Wright's mesothelioma. This is not to say that a jury must make this inference. Contrary inferences are possible; even plausible. However, the parsing of possible or plausible contrary inferences that might be drawn from the evidence is not the quintessence of summary judgment; it is the embodiment of a trial.

¶ 23 Order **REVERSED.** Case **REMANDED.** Jurisdiction **RELINQUISHED.**