J-A28042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JACQUELINE S. WAGNER & THOMAS WAGNER, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| STANDARD STEEL, LCC, | |
| Appellee | No. 850 EDA 2016 |

Appeal from the Order Entered February 18, 2016
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 140703015

BEFORE:  PANELLA, J., SHOGAN, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED JANUARY 26, 2017**

Appellants, Jacqueline S. and Thomas Wagner, appeal from the order of February 18, 2016, which granted the motion of Appellee, Standard Steel, LCC, for summary judgment in this tort action arising out of Appellant Mrs. Wagner's alleged exposure to asbestos.  On appeal, Appellants claim that the trial court erred in finding that a bankruptcy court order acted as a bar to the instant action and in finding that Appellee did not owe a duty of care to Appellant Mrs. Wagner.  For the reasons discussed below, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We take the underlying facts and procedural history in this matter from the trial court's April 20, 2016 opinion and our independent review of the certified record.

[Appellants] commenced this suit against [Appellee] by way of [c]omplaint on July 2[5], 2014, alleging [Appellant] Jacqueline Wagner was injured through exposure to asbestos in her household from fibers brought home on the asbestos-contaminated clothing of her husband, [Appellant] Thomas Wagner, from 1970 to 1972. During this [ ] period, [Appellant] Mr. Wagner worked as a laborer (material handler) and as a crane operator at a wheel and axle manufacturing facility located in Burnham, Pennsylvania ("the Burnham Facility"). In 1989, Freedom Forge Corporation ("Freedom Forge") acquired the Burnham facility by means of a leveraged buyout. [Appellee] is the current owner and operator of the Burnham Facility, which it purchased from Freedom Forge in 2002 through a bankruptcy court asset auction. [Appellants] contend [Appellee] is liable as a successor-in-interest to Freedom Forge for [Appellant] Mrs. Wagner's alleged secondary or "take-home" exposure to asbestos.[a] More specifically, [Appellants' c]omplaint asserts [Appellee] "failed to exercise reasonable care to protect [Appellant] Mrs. Wagner and others similarly situated from the hazardous, dangerous and harmful conditions that existed on its property." ([Appellants'] Compl., at ¶ 13.)[b] [Appellant] Mrs. Wagner was diagnosed with malignant mesothelioma in September of 2013.[c] Her deposition was taken in connection with the instant matter on August 14, 2014. In addition, [Appellant] Mr. Wagner was deposed on January 28, 2015.

[a] Following the lead of the Third Circuit Court of Appeals for the United States in *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3rd Cir. 2003), [the trial court] refrains from speculating as to whether there is a basis for such liability on the present record. *See TWA*, [*supra*] at [288 n. 4] ("Here we decline to speculate as to whether there is a basis for successor liability and, instead, assume for purposes of our analysis that but for the [s]ale [o]rder, [A]ppellants could have asserted viable successor liability claims against American.").

[b] This is not a "typical" asbestos appeal. In its motion papers, [Appellee] does not dispute that [Appellant] Thomas Wagner was regularly, frequently, and proximately exposed to asbestos at the Burnham facility. By the same token, [Appellee] does not appear to dispute that [Appellant] Jacqueline Wagner was exposed to and laundered her husband's asbestos-laden work clothing for a period of two years.

[c] Mesothelioma is a rare form of cancer affecting "the mesothelial tissue surrounding the lung," and few people develop the disease save for those who have been exposed to asbestos. ***Sporio v. W.C.A.B.***, 717 A.2d 525, 527 (Pa. 1998). Moreover, the disease has been medically linked to exposure to asbestos or asbestine products. ***Gutteridge v. A.P. Green Services, Inc.***, 804 A.2d 643, 652 (Pa. Super. 2002)[, *appeal denied*, 829 A.2d 1158 (Pa. 2003)].

On December 15, 2015, [Appellee] filed two (2) separate [m]otions for [s]ummary [j]udgment. [Appellants] filed [a]nswers to [Appellee's] [m]otions for [s]ummary [j]udgment on January 8, 2016. [Appellee] filed [r]eplies to [Appellants'] [a]nswers on January 15, 2016. [Appellants] filed [s]ur-[r]eplies to [Appellee's] [r]eplies on January 21, 2016. Subsequently, the [trial c]ourt held oral argument on both [m]otions for [s]ummary [j]udgment on February 16, 2016. Following oral argument, the [trial c]ourt granted [Appellee's] [m]otions for [s]ummary [j]udgment on February 18, 2016.[d] This appeal followed.[1]

[d] The [trial c]ourt agrees with [Appellee] that the June 28, 2002 Order of the United States Bankruptcy Court for the District of Delaware effectively extinguished [Appellants'] successor tort claims. That issue disposes of the case. As such, the [trial

---

[1] The trial court did not order Appellants to file a concise statement of errors complained of on appeal. ***See*** Pa.R.A.P. 1925(b). The trial court filed an opinion on April 20, 2016. ***See*** Pa.R.A.P. 1925(a).

c]ourt's [o]pinion will not address the viability of Appellee's other argument that a Pennsylvania premises owner does not owe a legal duty to warn a third-party of potential asbestos exposure not occurring on its premises.

**Freedom Forge's Bankruptcy Proceedings ([Appellants'] Exhibits D & E)**

In 1989, Freedom Forge . . . acquired the Burnham Facility through a leveraged buyout. Just as its predecessors had, Freedom Forge operated the plant under the "Standard Steel" name. In general terms, Freedom Forge was engaged in the business of "manufacturing and selling railway wheels, railway axles and other forged metal products from various facilities and locations in the United States." ([Appellants'] Ex. E, ¶14, at 8[])[.]

In 2001, Freedom Forge filed for protection under Chapter 11 of the United States Bankruptcy Code ("The Code") in the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court") under Case No. 01-02399-01. Consequently, in 2002, Freedom Forge marketed the sale of substantially all its assets to potential purchasers, including the Burnham Facility, free and clear of all liens, interests, encumbrances and claims of third parties (the "Freedom Forge [a]ssets"). On April 27, 2002, Standard Steel, Inc. ("SS Inc.") was formed as a Delaware corporation by a group of investors interested in purchasing the Freedom Forge [a]ssets pursuant to the Code. The same pool of investors then formed [Appellee] as a Delaware limited liability company on June 12, 2002.

On June 13, 2002, SS Inc. and Freedom Forge entered into an [a]sset [p]urchase [a]greement (the "[a]sset [p]urchase [a]greement") through which Freedom Forge agreed to sell, and SS Inc. agreed to purchase, the Freedom Forge [a]ssets. On July 22, 2002, SS Inc. assigned and transferred to [Appellee] all of SS Inc.'s rights and interests in the purchase of the Freedom Forge Assets under the terms detailed in the [a]sset [p]urchase [a]greement.

**Delaware Bankruptcy Court Order ([Appellee's] Exhibit B-1)**

On June 28, 2002, the [b]ankruptcy [c]ourt entered an [o]rder approving the terms of the [a]sset [p]urchase [a]greement as well as the sale of Freedom Forge [a]ssets.[2] The [b]ankruptcy [c]ourt sitting in Delaware made the following findings and determinations in regards to this transaction:

> • The sale price was fair and reasonable, and the transaction was undertaken at arm's length.

> • The sale agreement and the transactions contemplated pursuant to the agreement were negotiated by the parties without collusion and in

---

[2] The order provided in pertinent part:

20. All persons and entities (including, without limitation, any federal, state or local governmental agency, department or instrumentality) holding Liens or Claims against the Debtors' assets or the [p]urchased [a]ssets hereby are barred on and after the Closing from asserting such Liens and Claims of any kind and nature against the Buyer, its successors or assigns, of the [p]urchased [a]ssets, except as provided in the [[a]sset [p]urchase [a]greement] and the [modified labor agreement].

21. To the greatest extent allowed by applicable law, the Buyer is not assuming nor shall it in any way whatsoever be liable or responsible, as successors or otherwise, for any liabilities, debt or obligations of the Debtors [Freedom Forge and the other bankruptcy debtors] (other than the [a]ssumed [l]iabilities as and to the extent expressly provided in the [[a]sset [p]urchase [a]greement]) or any liabilities, debts or obligations in any way whatsoever relating to or arising from the [p]urchased [a]ssets or the Debtor's operations or use of the [p]urchased [a]ssets by virtue of the transfer or assignment of the [p]urchased [a]ssets, except as provided in the [[a]sset [p]urchase [a]greement] and the [term sheet describing the claims to be allowed and paid pursuant to the Freedom Forge [b]ankruptcy [c]ourt [o]rder.

(Order Pursuant to Section 1129 of the Bankruptcy Code, 6/28/02, at 14).

good faith within the meaning of Section 363(m) of the Code.

• Save for the assumed liabilities expressly outlined in the sale agreement, the assets purchase was effectuated "free and clear" of all interests and claims.

• "A sale of the [p]urchased [a]ssets other than one free and clear of all claims . . . or interests would (i) materially and adversely impact Debtors' estates, and (ii) yield substantially less value for the . . ., estates with less certainty than the available alternatives."

• Sufficient due notice of the sale confirmation hearing was provided in accordance with the Code and all Bankruptcy Rules.

(Trial Court Opinion, 4/20/16, at 1-4) (some record citations omitted).

On appeal, Appellants raise the following questions for our review:

[1] When the evidence is viewed in accordance with the applicable standards, did the trial court err in granting [Appellee's] [m]otion for [s]ummary [j]udgment [b]ased on Bankruptcy Court [o]rder (Control No. 15122118) on the grounds that, as a matter of law, [Appellee's] purchase of certain assets through a sale conducted pursuant to Section 363 of the United States Bankruptcy Code ("the Bankruptcy Code"), 11 U.S.C. § 363, acted as a complete bar to the claims of [Appellants] against [Appellee], even though, at the time of the sale, [Appellants] did not have any legal claims that could have been asserted against either the selling debtor or [Appellee], and [Appellee] is, as a matter of law, the successor-in-interest to the selling debtor?

[2] When the evidence is viewed in accordance with the applicable standards, did the trial court err in granting the [m]otion for [s]ummary [j]udgment of [Appellee] [r]e:  [n]o [l]egal [b]asis for [a]ny [c]laim (Control No. 15121988) on the grounds that, as a matter of law, [Appellee] did not owe any duty of care to persons outside its premises (such as [Appellant]

Jacqueline Wagner) with respect to activities conducted by [Appellee] on its premises where (a) [Appellee] knew, or with the exercise of reasonable care should have known, that such activities involved an unreasonable risk of harm to persons outside its premises and (b) the risk of injury to persons such as [Appellant] Jacqueline Wagner as a result of such activities was foreseeable by [Appellee]?

(Appellants' Brief, at 5-6) (emphasis and citations omitted).

On appeal, Appellants challenge the trial court's grant of summary judgment in favor of Appellee. (*See* Appellant's Brief, at 21-48). We briefly note our scope and standard of review.

Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the fact-finder. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate court may disturb the trial court's order only upon an error of law or an abuse of discretion.

*Dibish v. Ameriprise Financial, Inc.*, 134 A.3d 1079, 1084-85 (Pa. Super. 2016), *appeal denied*, 141 A.3d 481 (Pa. 2016) (citation omitted).

The dispositive issue in the instant matter is whether the trial court erred in finding that Appellants' claims against Appellee are barred under the United States Bankruptcy Code and, specifically, the bankruptcy court's June 28, 2002 order. Appellants argue that,

> the trial court erred as a matter of law in its analysis of the controlling authorities relating to the extinguishment of claims by way of a Section 363 bankruptcy sale where the claim that is sought to be barred had not ripened and did not exist, as a matter of bankruptcy law, at the time of the asset sale.

(Appellants' Brief, at 22-23). Conversely, Appellee maintains that,

> [Appellants'] tort action is barred by [Section] 363 of the Bankruptcy Code and the [B]ankruptcy [C]ourt order approving the "free and clear" sale of [Freedom Forge's] assets. The parties agree that Third Circuit precedent controls, and the Third Circuit precedent has held that a bankruptcy court's [Section] 363 sale order cuts off third-party claims against an asset purchaser. [Appellants'] reliance on other Third Circuit precedent is unavailing because none of those cases examined the viability of a tort action against an asset purchaser following a bankruptcy court approved [Section] 363 asset sale.

(Appellee's Brief, at 9). After a thorough review of the relevant cases from the United States Court of Appeals for the Third Circuit,[3] we agree with the trial court that Section 363(f) of the Code bars Appellants' claims.

---

[3] We note "decisions of the federal district courts . . . are not binding on Pennsylvania courts, even when a federal question is involved. Nevertheless, these decisions are persuasive authority and helpful in our review of the issue presented." *Dietz v. Chase Home Finance, LLC*, 41 A.3d 882, 886 n.3 (Pa. Super. 2012); *see also Kleban v. Nat. Union Fire Ins. Co. of Pittsburgh*, 771 A.2d 39, 43 (Pa. Super. 2001) ("While we

*(Footnote Continued Next Page)*

Section 363(f) of the Code in relevant part provides:

**(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

> **(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;

> **(2)** such entity consents;

> **(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

> **(4)** such interest is in bona fide dispute; or

> **(5)** such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). In determining that Section 363(f) bars Appellants' claim, the trial court relied on the Third Circuit's decision in ***TWA***, ***supra***. (***See*** Trial Ct. Op., at 6-9).

The trial court cogently summarized ***TWA***, ***supra***, as follows:

> In ***TWA***, the United States Court of Appeals for the Third Circuit carefully examined whether successor tort claims could properly be regarded as extinguished following a § 363(f) asset sale. [***See***] ***TWA***, ***supra*** at 288-93. There, at the conclusion of a bankruptcy auction on February 28, 2001, American Airlines ("American") tendered an offer to purchase substantially all of financially troubled Trans World Airlines, Inc.'s ("TWA") assets for $742 million. [***See***] [***i***]***d.*** at 286. TWA's Board of Directors voted in favor of the sale. [***See***] ***id.*** But employment

*(Footnote Continued)* _____

recognize that federal court decisions are not binding on this court, we are able to adopt their analysis as it appeals to our reason.") (citation omitted).

discrimination claims were still pending against TWA before the EEOC at the time of the sale. [*See*] [*i*]*d.* In addition, TWA had previously settled a class action with roughly 2,000 of its flight attendants by offering them travel vouchers. [*See*] [*i*]*d.* at 285. Both the EEOC and the class action litigants lodged objections to the sale. [*See id.*] at 286-87. After holding an evidentiary hearing concerning those objections, the [b]ankruptcy [c]ourt approved the sale. [*See*] [*i*]*d.* at 287. The [b]ankruptcy [c]ourt's [Section] 363 sale order expressly enjoined all persons from taking any action to recover against American as a successor-in-interest for TWA's tortious conduct. [*See*] [*i*]*d.*

Both the EEOC and the class action litigants appealed, arguing that the [b]ankruptcy [c]ourt sale order improperly extinguished their claims. [*See*] [*i*]*d.* at 287-88. More particularly, the EEOC and the class action litigants argued before the Third Circuit that the phrase "interests in property" as used in § 363(f) of the Code has a narrow or limited meaning. [*See*] [*i*]*d.* According to the appellants, such interests refer only to "liens, mortgages, money judgments, writs of garnishment and attachment, and the like, and cannot encompass successor liability claims arising under federal antidiscrimination statutes and judicial decrees implementing those statutes." [*Id.*] at 288. The airlines, by contrast, maintained that, "while Congress did not expressly define 'interest in property,' **the phrase should be broadly read** to authorize a bankruptcy court to bar any interest that could potentially travel with the property being sold, even if the asserted interest is unsecured." *Id.* (emphasis added). The airlines' argument ultimately prevailed. [*See*] [*i*]*d.* at 288-93[.]

The Third Circuit in **TWA** determined American could not be held liable for the undischarged employment discrimination claims of former TWA employers or for the travel vouchers awarded to TWA's flight attendants. [*See*] [*i*]*d.* at 293. Its holding was based on the fact that § 363(f) expressly authorizes the sale of a bankruptcy estate's assets free and clear of "any interest" whatever in the property, as opposed to merely "*in rem*" interests or liens. The **TWA** court noted that, if Congress intended to limit the reach of Section 363(f) to monetary claims, security interests and similar obligations, it could have easily selected more restrictive terminology: "Since 'lien' is a defined term under the Bankruptcy Code, it stands to reason that

Congress would have used the term 'lien' instead of 'interest,' had it intended to restrict the scope of § 363(f) to liens." [*Id.*] at 290 (citations omitted). The ***TWA*** court further reasoned that the claims at issue qualify as "interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold." *Id.* It elaborated that: "[T]he assets of the debtor . . . gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would have not have arisen." *Id.* Accordingly, the TWA court concluded that the discrimination and voucher claims were extinguished by virtue of the assets sale. [***See***] [*i*]*d.* at 293.[e]

> [e] In addition, the ***TWA*** court found that, even assuming these claims did not qualify as "interests in property," the [b]ankruptcy [c]ourt's order would not be disturbed because "the priority scheme of the . . . Code supports the transfer of TWA's assets free and clear of the claims." [***Id.***] at 291. It explained that: "[V]arious classes of creditors [are] . . . entitled to satisfaction before general unsecured creditors may access the pool of available assets." *Id.* The EEOC and class action claimants would be treated or regarded as general unsecured creditors. [***See***] [*i*]*d.* By virtue of their low priority in the context of a bankruptcy, the ***TWA*** court concluded that "[t]o allow the claimants to assert successor liability claims against American while limiting other [secured] creditors' recourse to the proceeds of the asset sales would be inconsistent with the . . . Code's priority scheme." *Id.* at 292.

(Trial Ct. Op., at 6-7).

If one examines the facts in the instant matter, there is little to distinguish this case from ***TWA***.[4] Appellants' claim arose out Freedom

_____

[4] Appellants attempt to distinguish ***TWA*** by asserting that it only deals with claims that were present at the time of the asset sale, while the instant
*(Footnote Continued Next Page)*

Forge's allegedly negligent conduct in the early 1970s. In 2002, prior to the initiation of the instant action, Appellee purchased almost all of Freedom Forge's assets through a Section 363 asset purchase agreement. The bankruptcy court approved the sale and specifically found that Appellee: paid a reasonable price in an arm's length transaction; the sale and agreement were negotiated without collusion and in good faith; the sale was free and clear of all interests and claims; to do otherwise would impact the debtor's estates and result in less value for the estate; and there was sufficient notice of the sale. (**See** Order Pursuant to Section 1129 of the Bankruptcy Code, 6/28/02, at 2-3, 7, 12-14, 20-23, 27).

Further, because all of the allegedly negligent conduct occurred at the Burnham site, Appellants' tort action against Appellee "is connected to or arises from" the assets that Appellee purchased from Freedom Forge in 2002. **TWA**, **supra** at 290. As the **TWA** court reasoned, if Freedom Forge had declined to invest in factories which employed workers such as Appellant, Thomas Wagner, and if Freedom Forge had not used asbestos in

*(Footnote Continued)* ⸻

matter deals with future claims. (**See** Appellants' Brief, at 31-32). This is not correct. While the travel voucher settlement was a present claim, the EEOC claims had not been filed in court and it was unclear at the time of the TWA decision if any of the claims would be filed in court. **See TWA**, **supra** at 285-86. The **TWA** court particularly noted that because the EEOC claims were future claims, they were more likely than the travel voucher settlement to cause a diminution in the value of TWA's assets because the buyer would be unable to estimate the "magnitude of the damages" in such claims. **Id.** at 292-93.

such sites, Appellants' successor tort claims would not exist. *See id.* Section 363(f) of the Code allows the sale of such assets "free and clear" of interests like Appellants' successor tort claims. *See id.* at 293. Thus, the trial court did not abuse its discretion or commit an error of law in finding that ***TWA*** bars Appellants' successor tort claims.

Moreover, we find Appellants' contention that the instant matter is controlled by the Third Circuit's decisions in ***Matter of Frenville Co., Inc.***, 744 F.2d 332 (3d Cir. 1984), *cert. denied*, 469 U.S. 1160 (1985), and the subsequent cases interpreting it, ***In re: Grossman's Inc.***, 607 F.3d 114 (3d Cir. 2010) (*en banc*), and ***Wright v. Owens Corning***, 679 F.3d 101 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 1239 (2013), entirely misplaced. (***See*** Appellants' Brief, at 25-33). As discussed by both the trial court in its opinion (***see*** Trial Ct. Op., at 10) and by Appellee in its brief (***see*** Appellee's Brief, at 15-19), the ***Frenville*** line of cases concern an entirely separate and distinct legal concept, the discharge of legal claims against a debtor, not successor liability following an asset purchase sale.

In ***Frenville***, the creditors of the Frenville Company filed an involuntary bankruptcy petition against it. ***Frenville***, ***supra*** at 333. Avellino and Bienes (A & B), was a certified public accounting firm, which had prepared certified financial statements for Frenville. *See id.* One year after the filing of the bankruptcy petition, two banks filed suit against A & B, claiming that the certified financial statements it prepared on behalf of

Frenville were fraudulent. *See id.* A & B sought relief from the automatic stay in order to bring a third-party complaint against Frenville. *See id.*

In concluding that the automatic stay did not bar A & B's complaint, the Third Circuit engaged in a detailed legal analysis of the Section 362(a), the automatic stay provision of the Code, as well as Congress' intent in enacting it, and the social policy concerns underlying it. *See id.* at 334-35. Ultimately, the Court concluded that only "proceedings that could have been commenced or claims that arose before the filing of the bankruptcy petitions are automatically stayed." *Id.* at 335. However, the Court concluded that there was no claim until there was a "right to payment." *Id.* at 335-36. The Third Circuit found that, when applying the appropriate state law, A & B could not have filed a third-party complaint against Frenville until after the service of the answer in the underlying action. *See Id.* at 337. Thus, the Court held that A & B's claim had not arisen pre-petition, and, therefore, could not be discharged in a Chapter 7 bankruptcy. *See id.* at 338.

Some twenty-six years after the *Frenville* decision, an *en banc* panel of the Third Circuit specifically over-ruled it. *See Grossman's*, *supra* at 121. In so doing, the Court noted the almost universal disapproval of *Frenville* by other federal courts of appeal and bankruptcy courts. *See id.* at 120. Like the instant matter, *Grossman's* concerned the alleged exposure to asbestos, in this case by a consumer who purchased home remodeling products from Grossman's, a home improvement store. *See id.*

at 117. Approximately twenty years after the appellee purchased the products, Grossman's filed for Chapter 11 bankruptcy. In its reorganization plan, it purported to discharge all claims which arose before the plan's effective date. *See id.* Roughly ten years later, appellee manifested symptoms of mesothelioma, and filed suit against Grossman's successor-in-interest. *See id.* Following *Frenville*, the bankruptcy court found the reorganization plan did not discharge the appellee's claim because, while her exposure pre-dated the plan, her claim did not arise under state law until "the injury manifests itself." *Id.* at 118 (citation omitted).

The Third Circuit overruled *Frenville*, holding that its "accrual test . . . imposes too narrow an interpretation of a 'claim' under the Bankruptcy Code." *Id.* at 121. Instead, the Court held that a "claim arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a right to payment under the Bankruptcy Code." *Id.* at 125 (citation and internal quotation marks omitted). In so doing, the Court specifically discussed Congressional concerns that "future claims by presently unknown claimants could cripple the debtor's reorganization." (*See id.* at 126-27). However, the Third Circuit reiterated that before a court could decide that a pre-petition claim was barred by reorganization, the lower court must decide whether the claimant had adequate notice of the bankruptcy proceedings. *See id.* at 127-28.

- 15 -

Approximately two years later, in **Wright**, **supra**, the Third Circuit again revisited the **Frenville** and **Grossman's** cases. Noting that **Frenville** had been the law in the Third Circuit for a lengthy period, the Court found that bankruptcy notices sent out during the **Frenville** period were not adequate because, under **Frenville**, future plaintiffs did not have a claim at that time. **See Wright**, **supra** at 108. Thus, the Court concluded that the **Frenville** test should continue to apply to individuals who held claims based upon exposure to a product or conduct pre-petition if the reorganization plan was confirmed prior to the date of the decision in **Grossman's**; and to individuals who held claims based upon conduct or exposure post-petition but pre-confirmation, if the reorganization plan was confirmed prior to the date that the Court decided **Wright**. **See Wright**, **supra** at 109.

Here, Appellants claim that because Freedom Forge's liquidation plan was confirmed prior to the decisions in **Grossman's** and **Wright**, "the **Frenville** test controls the issue of whether [Appellants'] claims are barred[.]" (Appellants' Brief at 30; **see also id.** at 29-31). However, Appellants' argument suffers from a fatal flaw. As discussed above, the **Frenville** line of cases arose out of debtor's attempts to discharge claims, including future claims in bankruptcy. These decisions are wholly intertwined with those portions of the Code concerning discharge of claims and with the social policy issues that attempt to balance Congressional

- 16 -

concerns with allowing debtors to reorganize and make a fresh start, with the rights of future claimants to due process.

Appellee is not a debtor and Appellants were not harmed by exposure to Appellee's product or conduct. Appellants fail to cite to any case that has applied ***Frenville*** outside of the discharge context and fail to cite to any case that has even discussed ***Frenville*** as having any possible applicability to an asset purchase sale under Section 363(f). (***See*** Appellants' Brief, at 25-35). Further, Appellants do not make any argument as to why we should take ***Frenville*** out of context and apply it to the instant situation. (***See id.***). Given this, and given the near-universal disapproval of ***Frenville***, as discussed by the Third Circuit in ***Grossman's***, ***see Grossman's***, ***supra*** at 120, we see no basis for importing the ***Frenville*** test into a case involving an asset purchase sale. Thus, the trial court did not abuse its discretion or commit an error of law in declining to apply the ***Frenville*** test to the instant matter.[5]

_____

[5] Appellants also contend, based on the ***Frenville*** line of cases, that they did not receive adequate notice of the bankruptcy proceedings. (***See*** Appellants' Brief, at 35-38). However, given that we have declined to apply ***Frenville*** to the instant matter and that, as the trial court correctly noted, (***see*** Trial Ct. Op., at 9), the bankruptcy court found that there was adequate notice, and Pennsylvania courts must give federal judgment full faith and credit, we decline to address this issue. ***See Atiyeh v. Bear***, 690 A.2d 1245, 1249–50 (Pa. Super. 1997), *appeal denied*, 698 A.2d 63 (Pa. 1997) (applying collateral estoppel doctrine to decision of bankruptcy courts, and precluding relitigation of same issue in this Court).

Appellants also allege that the trial court erred finding that Appellee had no duty of care to Appellant Mrs. Wagner. (**See** Appellants' Brief, at 38-47). However, because our holding that the trial court was correct in finding that the asset purchase sale bars Appellants' claims is dispositive, we need not address this issue.

For the reasons discussed above, we hold that the trial court neither abused its discretion nor made an error of law in granting summary judgment in this matter. **See Dibish**, **supra** at 1084-85. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2017